**In re the MARRIAGE OF Marianne Bethke and Gundolf J. BETHKE.**

**Upon the Petition of Marianne Bethke, Petitioner–Appellee,**

**And Concerning Gundolf J. Bethke, Respondent–Appellant.**

No. 91–627.

Court of Appeals of Iowa.

Feb. 25, 1992.

Mark McCormick and Margaret C. Callahan of Belin Harris Lamson McCormick, A Professional Corp., Des Moines, for respondent-appellant.

Edward J. Gallagher, Jr. and Cynthia A. Scherrman of Gallagher, Langlas & Gallagher, P.C., Waterloo, for petitioner-appellee.

Heard by OXBERGER, C.J., and SCHLEGEL and SACKETT, JJ., but decided en banc.

SACKETT, Judge.

This appeal challenges the economic provision of a decree dissolving a twenty-year nontraditional marriage. Respondent-appellant Gundolf J. Bethke contends the economic provisions made by the trial court left him with less than twenty-five percent of the parties' accumulated property. He contends this fact, and the refusal of the trial court to award him alimony, was not equitable and was not a gender-neutral decision. We modify the decree. We modify certain parts of the property division and order that Gundolf receive alimony.

Petitioner-appellee Marianne Bethke is a medical doctor who practices a specialty of gynecology. Since 1976 she has had a demanding and financially rewarding career. She has worked long hours and during home hours has frequently been on call. During these years, Gundolf has not been fully employed outside the home. He has assumed substantial responsibilities for the parties' child, their home and family, and family business.

Gundolf is fifty-six years old and Marianne is fifty-two years old. They met in September 1970. Gundolf was working for an insurance company in the area of pension and retirement plans. He had attended business school for three years. He had worked in commercial banking from 1956 to 1969 in Canada and in the United States.

In July 1970 Gundolf had made a commitment that effective January 1, 1971, he would move to Germany and work for a European insurance company in a similar capacity. The parties married on October 31, 1970. They both brought assets of less than $3,000 into the marriage. Gundolf had been married before and had a child by that marriage who was not in his custody. He was delinquent in his child support obligation. At the time of marriage, Marianne had a medical degree. She had completed a residency and internship. She had worked for two months in a private practice in her specialty of obstetrics and gynecology.

After marriage, the couple moved to Germany. Gundolf worked in his chosen field. Marianne was not able to be certified in Germany in the areas of obstetrics and gynecology. Initially she worked in a private hospital and a Red Cross hospital for no salary. In September 1972 Christina, the couple's only child, was born. Marianne left the job market for a year. Then she found a job with the U.S. Army in Munich. She had excellent hours, although she was not working in her areas of specialty. During this time, Marianne took a written examination seeking to become board-certified in her specialty in the United States.

Marianne wanted to return to the United States. The parties did in 1976. They disagree about whether Gundolf shared Marianne's desire to return to the United States and the career sacrifices Gundolf made to return. Gundolf contended at the time they moved he was in line for a substantial promotion. Marianne denies this, and contends both parties wanted to move because they wanted their daughter raised in the United States.

The couple moved to Waterloo in September 1976. The couple's roles changed, and Marianne became the family's primary wage earner. Her job was demanding. She was frequently on call during evening and weekend hours. In 1979, Marianne passed the oral portion of the examination for board certification, and in 1981 she formed a professional corporation and worked for the corporation as its sole medical doctor. Her maximum income came in 1989 when her earnings totaled about $200,000. At the time of trial, she had eliminated her obstetrics practice and estimated an annual income at approximately $150,000. Her net monthly earnings, after taxes, were $7,000.

When the parties moved to Waterloo, Gundolf began selling an investment stock. This employment was not satisfactory to him. He then purchased an independent insurance claims, adjusting, and investigation business. He worked in the business but limited his hours so he would be home when Christina got out of school. He was home in the evenings, because Marianne was frequently on call. He was responsible for the shopping, the cooking, maintenance of the house and lawn, and paid the family expenses. He did not do all the cleaning and child care himself, but was responsible for hiring and supervision of those people that assisted with household chores. He also assumed some business responsibilities for Marianne's professional corporation. He worked at her office about an hour a day writing pay checks, meeting the accountant, and consulting with the persons who handled the collections for her practice. He also served as the trustee of Marianne's pension plan and directed the investments of the plan. In 1988 he sold the claims business.

In 1981 Gundolf suffered a heart attack. He has made a satisfactory recovery but continues under a cardiologist's care. He has arthritis and a partially blocked artery. He has been hospitalized for dizzy spells from an unknown cause. During the marriage, his employment skills became outdated. After the parties separated, he conducted a job hunt. He ultimately found employment with a new venture electronics firm in Des Moines. He is responsible for determining European market potential. He is paid a salary of $1,000 monthly. If the company actually sells products, he will receive a commission on his sales. It is not anticipated there will be sales for at least three years. Gundolf loaned the business $25,000 to help it become established. He has a stock option but does not own any

stock in the business. His employment provides no pension or health benefits. The business is marginally financed and there is little employment security.

The trial court awarded Gundolf equities of nearly $300,000. Gundolf contends the trial court's division awarded him less than twenty-five percent of the assets the parties accumulated during the marriage. Marianne contends the trial court's division awarded him forty percent of the assets the parties accumulated during the marriage. The dispute centers on the valuation of three assets awarded to Marianne. These assets are a condominium in Toronto, Canada, Marianne's professional corporation, and an insurance policy with the Great West Life Company.

 To accurately assess the equity of the property division, we must determine from the evidence the value of these three assets. We review the evidence de novo. Iowa R.App.P. 4. The trial court did not specifically determine the value of the condominium. From the trial court's other findings, we determine the trial court in allocating assets considered the value of the parties' interest in the condominium was about $25,000. The condominium was occupied by Marianne's parents. The evidence is it has a market value of $350,000 in Canadian dollars. Marianne's parents have an unrecorded lease on the premises running through the year 2012. The condominium was purchased by Marianne and Gundolf in 1983. The purchase was made in part with money loaned by Marianne's parents to Marianne and Gundolf. The loan was for $67,000, and Gundolf and Marianne gave Marianne's parents a mortgage on the premises in that amount. Marianne and Gundolf have made monthly payments on the $67,000 loan, and the current balance on the obligation is $45,000. Marianne's parents pay no rent for the condominium. They use the payments made on the mortgage for condominium costs and real estate taxes. It is not anticipated Marianne's parents will live through the lease period. If they do not, Marianne, as their heir, would inherit the balance of the lease. The lease arrangement was the result of a joint decision of Marianne and Gundolf. It was intended to assist Marianne's parents in obtaining and maintaining a retirement home. Gundolf contends in assessing the equity of the property division, the condominium should be valued at market value and both the mortgage and the lease should be ignored. We disagree. The mortgage represents money actually loaned to the parties by Marianne's parents. Both parties assented to Marianne's parents living there during their lifetimes. We find, however, the condominium represents a substantial asset, and its total allocation to Marianne is not equitable. We find the parties' interest in the condominium in United States dollars, less the mortgage and less Marianne's parents' life estate, to be $160,000. We modify the decree to provide that a one-half interest in the condominium shall be Marianne's and a one-half interest in the condominium shall be Gundolf's. The parties' interests are subject to the existing lease for the lifetime of Marianne's parents and the mortgage on the premises. We give Marianne the right to buy Gundolf's equity for $80,000 in the six months following the date of this decree.

 The next question is whether the trial court properly valued Marianne's professional corporation. Gundolf contends the equity Marianne has in her professional corporation is $131,895; Marianne contends it is $20,108. In making the allocation of assets, the trial court accepted Marianne's valuation. Gundolf's valuation attributes considerable value to good will. Good will in a professional practice is dependent on the ability of the professional to continue to practice his or her profession. *In re Marriage of Hogeland*, 448 N.W.2d 678, 681 (Iowa App.1989). The good will of a professional corporation is a factor that bears on the future earning potential of the professional. *Id.* We consider future earning capacity in considering the equities of the economic provisions of a dissolution. *Id.* The future or good will of a professional practice is a factor that needs to be considered in assessing the economic issues in a dissolution. *Id.* We accept Marianne's valuation of the professional corporation in assessing the property division, and we affirm the allocation of this asset to

her. We consider Marianne's projected future earnings, however, in addressing Gundolf's claim for alimony.

■ The third issue is the valuation of a life insurance policy Marianne bought as an investment. The policy carries a death benefit of $500,000. The premiums on the policy are paid in five annual installments. The policy's cash value in the early years are very low, even though premiums are large. The policy then has substantial cash value in later years. There are tax benefits to Marianne in such a policy. Marianne put no value on the policy. Gundolf's expert valued the policy at $24,000. It is not equitable to consider the insurance policy valueless. We direct that Marianne shall pay to Gundolf the sum of $12,000 to compensate him for her receiving the policy.

We modify the property division to provide that Gundolf be entitled, in addition to the property he was given by the trial court, to receive an undivided one-half interest in the Canadian condo, subject to the lease and mortgage to Marianne's parents and subject to Marianne's right to purchase Gundolf's share. We further provide that Marianne shall pay Gundolf an additional sum of $12,000.

■ Gundolf contends it was not equitable for the trial court to refuse to award him alimony. We agree. Iowa provides statutorily that spousal support can be ordered paid to either spouse. Reported Iowa cases where wives have paid husbands alimony are rare. We are guided by Iowa cases where husbands have been ordered to pay wives alimony. We ignore gender in assessing the alimony issue. To do otherwise would be contrary to chapter 598, and would be constitutionally impermissive. The United States Supreme Court, in determining an Alabama statute imposing alimony obligations only on men was unconstitutional, said:

> In authorizing the imposition of alimony obligations on husbands, but not on wives, the Alabama statutory scheme "provides that different treatment be accorded ... on the basis of ... sex; it thus establishes a classification subject to scrutiny under the Equal Protection Clause," (cite omitted). The fact that the classification expressly discriminates against men rather than women does not protect it from scrutiny.

*Orr v. Orr,* 440 U.S. 268, 278–79, 99 S.Ct. 1102, 1111, 59 L.Ed.2d 306, 318–19 (1979).

We address the issue of awarding alimony under a gender-neutral classification and are careful in our consideration to avoid sexual stereotypes. *See Orr,* 440 U.S. at 283, 99 S.Ct. at 1113–114, 59 L.Ed.2d at 321.

This we see as a family who, after about four years of marriage, decided Marianne would be the primary wage earner. Her earning potential was substantial. Her earnings were sufficient to provide not only for the family's basic needs but also to afford them an upper class lifestyle. Gundolf, whose earnings were not necessary, assumed substantial responsibility for their daughter and their home. The parties during the marriage seemed satisfied with this arrangement. There was no need for Gundolf to maximize his earning capacity.

■ Marianne suggests in her testimony that she encouraged Gundolf to be employed as their daughter got older because she thought he would be happier if he were. Gundolf contends Marianne's profession was very demanding, she worked very hard, and it was necessary for one family member to be available to handle daily life responsibilities. Clearly, both parties benefited from this arrangement. Marianne was able to pursue her professional career absent any substantial responsibilities for the care of the family and the home. Gundolf assumed these responsibilities and had an excellent lifestyle because Marianne worked hard at her profession. The roles the parties assumed in this marriage were roles they agreed to assume. At the time of dissolution, Marianne had an excellent career and employment future. Gundolf at fifty-six is reentering the work force. His skills are not current, and his employment opportunities are limited. Marianne has made substantial contributions to FICA. Gundolf has not. Mar-

ianne will have greater social security benefits. We look to the presence or absence of social security benefits in analyzing the equity of the financial aspects of a dissolution. *See In re Marriage of Schissel*, 292 N.W.2d 421, 427 (Iowa 1980); *Locke v. Locke*, 263 N.W.2d 694, 696 (Iowa 1978). While the marriage lasted over ten years, and Gundolf may have some rights to draw on Marianne's benefits, his benefits will be considerably less. *See Missel, Social Security Benefits and the Divorced Spouse*, Case & Com., Jan.–Feb. 1986 at 24. Marianne also has a pension plan. Gundolf cashed in his pension plan to help buy the parties' first house when they moved back to the United States. Gundolf's only pension account is a $75,000 account that was allocated by the trial court from Marianne's account. However, even with this allocation to Gundolf, Marianne retained $314,830 in her pension account.

There is considerable authority to award the disadvantaged spouse alimony under such circumstances. *See In re Marriage of Friedman*, 466 N.W.2d 689, 693 (Iowa 1991); *In re Marriage of Hitchcock*, 309 N.W.2d 432, 437–38 (Iowa 1981); *In re Marriage of Misol*, 445 N.W.2d 411, 413–14 (Iowa App.1989); *In re Marriage of Hayne*, 334 N.W.2d 347, 350–51 (Iowa App. 1983).

In awarding alimony we look to the particular circumstances of this case. The mandate is to achieve an equitable and just result under the circumstances. *See In re Marriage of Webb*, 426 N.W.2d 402, 405 (Iowa 1988). We look to Marianne's earning capacity and the standard of living the parties have maintained, as well as Marianne's relative ability to pay. *See In re Marriage of Imhoff*, 461 N.W.2d 343, 345 (Iowa App.1990). We look to the factors of section 598.21(3). This was a long-term marriage. Gundolf is older than Marianne. He has health problems. Marianne is in good health. The property division does not provide sufficient current funds for Gundolf to maintain the standard of living he enjoyed during the marriage. Gundolf's employment opportunities are very limited. Alimony is taxable to Gun-

dolf and deductible to Marianne. We did not consider the good will of Marianne's medical practice in valuing the assets, but we do consider it in assessing alimony. *See Hogeland*, 448 N.W.2d at 681. We order Marianne pay Gundolf alimony of $1,500 a month for ten years. The alimony shall terminate at the death of either party or on Gundolf's remarriage.

Gundolf requests appellate attorney fees. We award him $4,000. Costs on appeal are taxed one-half to each party.

AFFIRMED AS MODIFIED.