Suzanne McKINLEY, Plaintiff,

v.

IOWA DISTRICT COURT FOR POLK
COUNTY, Defendant.

No. 94–357.

Supreme Court of Iowa.

Jan. 17, 1996.

Rehearing Denied Feb. 14, 1996.

Victoria Herring, West Des Moines, for plaintiff.

Thomas J. Miller, Attorney General, and Bruce Kempkes, Assistant Attorney General, for defendant.

William W. Heaivilin, Des Moines, for amicus curiae Iowa Protection & Advocacy Services, Inc.

Considered by HARRIS, P.J., and CARTER, NEUMAN, SNELL, and TERNUS, JJ.

NEUMAN, Justice.

Plaintiff Suzanne McKinley brought this action for certiorari to challenge both the district court's order punishing her for contempt and the court's refusal to punish her former husband for contempt. Because we believe the court's findings and conclusions are supported by the requisite proof beyond a reasonable doubt, we annul the writ.

*Background Facts and Proceedings.*

In January 1993, Suzanne and Tim McKinley's twenty-year marriage ended in divorce. The parties were granted joint custody of their two daughters, then ages twelve and seven. Suzanne was named the girls' primary custodian, while Tim was granted reasonable visitation and ordered to pay $980 per month child support. The court also awarded Suzanne $210 per month alimony, payable for thirty-six months. The marital residence was ordered immediately sold and the proceeds divided "equitably." Suzanne was directed to make the monthly mortgage payments of $1038 pending sale.

The decree as described above departed significantly from temporary allowances which had required Tim to pay child support of $1090 per month plus $1038 per month "spousal support" payable directly toward the parties' mortgage. Suzanne, who suffers a compensable mental disability that renders her unemployable, immediately defaulted on the mortgage payments. The house sold by July, but the accumulated principal and interest on four months' unpaid mortgage installments, combined with a joint debt of $13,000 payable to Suzanne's father, left no equity to be divided.

Tim blamed the shortfall at the time of closing on Suzanne's allegedly willful failure to make the mortgage payments as ordered. He petitioned to have her found in contempt. Suzanne denied that her inaction was either willful or contemptuous. She countered with a claim that Tim should be found in contempt on a number of grounds, most notably for willfully failing to exercise the visitation granted him in the decree.

The petitions were consolidated for trial. Suzanne tendered two defenses for her failure to abide by the court's order: first, that the decree's reference to an "equitable" division of the house sale proceeds was ambiguous, thereby leaving her obligation uncertain and not subject to punishment by contempt; second, that her financial circumstances—as complicated by her mental disability—excused her failure to make the payments as ordered. The district court rejected these arguments, concluding under the record made that Suzanne "has engaged in a calculated and deliberate scheme to frustrate the intent of the Court in the dissolution decree, and to prevent Timothy from receiving the

property division ordered by the trial court." The court also rejected Suzanne's complaints about Tim's failure to abide by the decree, finding her allegations bordering on the frivolous.

As punishment for her contempt, the court sentenced Suzanne to "thirty days at hard labor" in the county jail. It then withheld mittimus for ninety days to enable her to purge her contempt by paying Tim the sum of $2651 plus interest, an amount calculated to reimburse him for the reduction in net proceeds at the closing caused by Suzanne's failure to make the mortgage payments.

We granted Suzanne's petition for certiorari. She raises seven points for review: (1) The evidence does not support a finding of contempt; (2) a noncustodial parent who willfully refuses or fails to comply with specific visitation orders should be compelled to do so; (3) the court erred in making "hard labor" a condition of her sentence; (4) the court intemperately and erroneously denied Suzanne's motion for recusal; (5) the court punished Suzanne for her attorney's adherence to the Iowa Rules of Civil Procedure; (6) the court erred when it awarded damages and interest from July 1, 1993; and (7) Suzanne should have received an award of attorney fees.

Our review is at law, not de novo. *Zimmermann v. Iowa Dist. Ct.*, 480 N.W.2d 70, 74 (Iowa 1992). The question is whether substantial evidence supports the court's judgment. *Ervin v. Iowa Dist. Ct.*, 495 N.W.2d 742, 744 (Iowa 1993). Contempt must be established by proof beyond a reasonable doubt. *Phillips v. Iowa Dist. Ct.*, 380 N.W.2d 706, 709 (Iowa 1986).

We shall consider Suzanne's arguments in turn.

■■■ A. *Proof of contempt.* Contempt is customarily defined as willful disobedience. *Ervin*, 495 N.W.2d at 744. "Willful disobedience" requires

> evidence of conduct that is intentional and deliberate with a bad or evil purpose, or wanton and in disregard of the rights of others, or contrary to a known duty, or unauthorized, coupled with an unconcern

whether the contemner had the right or not.

*Id.* The alleged contemner carries the burden of producing evidence on any defense tendered. *Skinner v. Ruigh*, 351 N.W.2d 182, 185 (Iowa 1984). The burden of persuasion on the willfulness issue, however, remains on the contemnee. *Ervin*, 495 N.W.2d at 745.

■ Two defenses to contempt are recognized: (1) indefiniteness of the order and (2) absence of willful disobedience caused by inability to pay. *Webb v. Iowa Dist. Ct.*, 416 N.W.2d 95, 97 (Iowa App.1987). Suzanne claims both defenses here.

■ 1. *Clarity of the order.* The decree ordered the parties' home sold immediately with "the net proceeds therefrom equitably divided" after satisfaction in full of the parties' debt to Ralph Chadek, Suzanne's father. Suzanne asserts use of the term "equitable" casts doubt on her obligation to Tim under the decree. The record makes plain, however, that Suzanne understood the court's intent that the proceeds be divided equally between them. Suzanne's posttrial motion under Iowa Rule of Civil Procedure 179(b) raised this very issue. The court's ruling rejected Suzanne's request for an "equitable," rather than an "equal" division of the proceeds. Thus Suzanne cannot rely on lack of clarity or definiteness in the decree's terms to escape responsibility for dividing the net proceeds equally with Tim.

■ 2. *Ability to comply.* The fighting issue centers, not on Suzanne's failure to distribute the proceeds, but on her failure to timely make the mortgage payments prior to the sale. She concedes her failure to abide by the decree's terms, but claims her inaction cannot be ascribed to willful disobedience.

Suzanne first contends she was financially unable to pay necessary expenses for herself and her daughters and still make the house payment. Financial records submitted in evidence bear out the claimed strain on her cash flow. Other evidence, however, supports the court's finding that Suzanne had sources of cash (a $5000 lump sum social security benefit payment and three retirement accounts) which she chose not to apply

to her obligation under the decree. As noted by the district court, her dissatisfaction with the decree does not excuse her compliance with its terms. *See Ervin*, 495 N.W.2d at 745. The record reveals no attempt by Suzanne to make even a partial payment on the mortgage. She was not free to prioritize her monthly financial obligations so as to prefer her own creditors over her court-ordered obligation to Tim. *See Skinner*, 351 N.W.2d at 186; *see also Callenius v. Blair*, 309 N.W.2d 415, 419 (Iowa 1981) ("[t]he test is not merely whether appellee is presently working or has current funds or cash on hand, but whether he has any property out of which payment can be made").

Whether Suzanne's default on the mortgage was willful or an unintended consequence of her mental illness was a hotly contested point at trial. Suzanne claimed the shock of the decree's terms left her feeling victimized, triggering the symptoms of her posttraumatic stress disorder. Her therapist testified that Suzanne's obligations under the decree (to prepare the house for sale and make the mortgage payments), coupled with her custodial responsibilities for the parties' two children, thrust her into a "survival mode" just to cope with the "hierarchy of demands" placed upon her. As part of this coping strategy, making the mortgage payment took on diminished importance. Tim presented no contradictory expert testimony.

Given the severity of Suzanne's disability, and the extent of testimony concerning it, we find it surprising the court's ruling makes no mention of it. Suzanne and amicus, Iowa Protection and Advocacy Services, Inc., highlight this alleged oversight as proof the court's finding of willfulness is unsupportable as a matter of law. Yet the court was not without opinion on the viability of Suzanne's defenses. Summing up, the court said:

> After viewing petitioner's demeanor on the witness stand, assessing the inconsistencies in her own testimony as well as the conflict between her testimony and the documentary evidence and hearing the other witnesses in the case, the court concludes that Suzanne's testimony as to the reasons for her failure to comply with the Court's order is entitled to virtually no weight.

■ We are obliged to give great deference to the trial court on issues of witness credibility. *State v. Hatter*, 342 N.W.2d 851, 854 (Iowa 1983). Substantial evidence in the record shows that Suzanne was capable of managing her affairs despite her illness. She paid other bills, prepared the house for sale, organized the family for the move, and secured other housing. The district court plainly believed that Suzanne's decision to ignore the mortgage payments stemmed from her disagreement with the decree, not her illness. From our vantage point we are unable to conclude otherwise as a matter of law.

■ B. *Tim's failure to exercise visitation.* Under the decree, Suzanne's custodial rights were "subject to [Tim's] right, privilege and *duty* of liberal visitation...." (Emphasis added.) The record reveals that Tim's post-divorce contact with the children has been minimal,[1] much to their unhappiness and Suzanne's chagrin. The district court, however, was unwilling to find Tim in contempt for his admittedly willful failure in this regard.

Suzanne argues forcefully that Tim's parental obligations are no less deserving of attention than hers. She offered testimony of weekly no-shows, vacations delayed awaiting plans from Tim that never materialized, and visits where the children ended up spending more time in the care of others than Tim. Moreover, Tim's refusal to set aside regular time for the children greatly impeded Suzanne's ability to schedule rehabilitative activities for herself. Thus his behavior has not only disappointed the children, it has given Suzanne no respite from the burden of single parenthood.

We are inclined to believe that visitation motivated solely by the threat of contempt could not truly be said to satisfy a child's

---

1. Tim admitted that from February 1993, when visitation was awarded, until January 1994, the date of the contempt proceeding, he had only twice exercised his weekly visitation, took only one of the four weeks to which he was entitled during the summer, and did not exercise his visitation rights for winter and spring breaks at all.

best interest. There is, however, some authority to the contrary. On the theory that something is better than nothing, one study has suggested that even bad noncustodial parent-child relationships help protect children from the painful loss and rejection following divorce. Janet M. Bowermaster, *Sympathizing with Solomon: Choosing Between Parents in a Mobile Society*, 31 U. Louisville J.Fam.L. 791, 836 (1992) (hereafter "Bowermaster") (citing Judith S. Wallerstein & Joan Berlin Kelley, *Surviving the Breakup: How Children and Parents Cope with Divorce*, 238–39 (1980)). Further studies, however, showed that in the long run, it was unclear whether continued contact with the noncustodial parent was beneficial. Bowermaster at 836 n. 238. The author notes that even noncustodial parents who greatly love their children forego visits because of difficulties in coping with the divorce. *Id.* at 836–37. Nevertheless, the author concludes, such parents "might later be grateful for the legal compulsion that forced them to maintain connections with their children." *Id.* at 837.

We are unaware, however, of any court that has attached sufficient importance to visitation to compel it. Of the two courts that have addressed the issue, both have refused to require a noncustodial parent to take advantage of visitation awarded under a decree. *See Dana v. Dana*, 789 P.2d 726, 730 (Utah App.1990) (while fostering relationship with noncustodial parent is important factor in best-interest analysis, compelling visitation with threatened increase in child support payments—to compensate for custodial parent's additional child care expense—would not foster positive parent-child relationship); *Louden v. Olpin*, 118 Cal. App.3d 565, 173 Cal.Rptr. 447, 449–50 (1981) (California statute giving father right to compel visitation privileges regardless of parents' marital status does not create reciprocal right in the child).

While we are sympathetic to Suzanne's plight, we are not convinced that visits coerced by threat of incarceration would be much better than no visits at all. Tim will understand soon enough the error of his ways. No court order can make up for the loss of his daughters' affection and respect.

Nor do we believe that Suzanne should be forced to endlessly rearrange her schedule to accommodate visitation Tim chooses not to exercise. Although beyond the scope of this proceeding, we observe these matters may be an appropriate topic for a modification of the decree.

C. *Sentence to "Hard Labor."* Suzanne contends the court was without authority to sentence her to thirty days "hard labor" in the Polk County jail in the event she did not purge her contempt.

 An action for contempt is quasi-criminal in nature. *Phillips*, 380 N.W.2d at 709. Although neither Iowa Code chapter 665 (general contempt) or section 598.23 (dissolution contempt) address the issue of hard labor as punishment, Iowa Code section 356.16 (governing jails and municipal holding facilities) provides:

> Able-bodied persons over the age of sixteen, confined in any jail under the judgment of any tribunal authorized to imprison for the violation of any law, ordinance, by-law or police regulation, may be required to labor during the whole or part of the time of their sentences, as hereinafter provided, and such tribunal, when passing final judgment of imprisonment, whether for nonpayment of fine or otherwise, shall have the power to and shall determine whether such imprisonment shall be at hard labor or not.

Based on this statute, we conclude it was within the court's discretion to require "hard labor" as part of Suzanne's sentence.

D. *Recusal.* During the contempt hearing Tim's counsel attempted to introduce bank records provided by Suzanne pursuant to a subpoena. Suzanne's counsel objected on hearsay grounds, arguing a qualified witness must attest to the records' validity. Judge Hutchison, obviously annoyed by what he believed was unnecessary delay, adjourned the hearing to allow counsel to find a proper witness but stated, "And I want it on the record that I will take this into account on my determination of attorney's fees."

Suzanne's counsel promptly filed a motion to recuse. Counsel argued that in commenting on the award of attorney fees before Suzanne had presented any evidence to explain her default on the mortgage, the court revealed that it had prejudged the merits of the case. The judge denied the motion.

■ "Actual prejudice must be shown before a recusal is necessary." *In Interest of C.W.*, 522 N.W.2d 113, 117 (Iowa App.1994); *see also In Interest of A.B.*, 445 N.W.2d 783, 784 (Iowa 1989) (fact that juvenile referee vigorously questioned witnesses furnished no basis for finding of prejudice compelling recusal). Although a litigant is entitled to a neutral and detached judge, "[t]here is as much obligation for a judge not to recuse when there is no occasion for him to do so as there is for him to do so when there is." *State v. Mann*, 512 N.W.2d 528, 532 (Iowa 1994) (quoting *Hinman v. Rogers*, 831 F.2d 937, 939 (10th Cir.1987)). The test is whether a reasonable person would question the judge's impartiality. *Mann*, 512 N.W.2d at 532.

■ Judge Hutchison's remarks on the motion to recuse reveal no prejudice on the merits of the contempt action. Although Suzanne complains that the question of her default is inextricably entwined with the issue of contempt, there is no dispute that she made no mortgage payments following the decree. As Suzanne's own definition of default reveals ("the omission to perform a legal or contractual duty"), default does not entail the same deliberate or willful requirement that contempt does. The court's seeming anger at counsel's insistence on strict proof of the default, therefore, does not automatically prove bias on the question of contempt. No actual prejudice has been shown.

E. *Punishment for adherence to the rules of civil procedure.* Suzanne contends the "air of prejudice" demonstrated by the court's refusal to recuse extended to the court's opinion about her cross-application for contempt against Tim. In its ruling, the court observed

[i]t is apparent that when served with Timothy's application, petitioner concluded that the best defense would be a good

offense. The court concludes that Suzanne hoped to gain through her counter-application for contempt some leverage concerning the decree provisions with which she knew she had not complied.

Suzanne complains, in effect, that she was punished for her counsel's procedural strategy rather than her own conduct. We find no merit in this contention. The court's comments, while perhaps superfluous, did not detract from the objective factual findings supporting its judgment of contempt. Again, no actual prejudice affecting the merits of the controversy has been shown.

F. *"Ex post facto" order.* The condition imposed by the court to permit Suzanne to purge her contempt included payment of interest from July 1, 1993, on the unpaid mortgage installment. Suzanne claims this interest assessment amounts to an ex post facto application of the law because it predates the application for contempt.

■ Constitutionally prohibited ex post facto laws are those that punish criminal conduct that was not criminal at the time the conduct occurred. *State v. Quanrude*, 222 N.W.2d 467, 469–70 (Iowa 1974); *State v. Bean*, 474 N.W.2d 116, 119 (Iowa App.1991). Suzanne cites no authority extending this principle to the case before us. The court was merely attempting to enforce the intent of the decree by making Tim whole despite Suzanne's default. The assignment of error is without merit.

■ G. *Attorney fees.* Finally, Suzanne claims the court erred by failing to award her attorney fees. Such an award, of course, is discretionary with the trial court. *In re Marriage of Giles*, 338 N.W.2d 544, 546 (Iowa App.1983). Given the relative merits of the parties' positions, and the outcome, we cannot say the court abused its discretion by refusing to compensate Suzanne for the expense of counsel.

*Summary.*

We conclude that substantial evidence supports the district court's decision finding Suzanne in contempt. We also note, however, that Suzanne's appeal of the dissolution decree, decided by our court of appeals *after*

the contempt hearing but *before* the certiorari was submitted for argument, effectively purges Suzanne of her contempt by shifting responsibility for the mortgage payments to Tim. Accordingly, we annul the writ, but express our hope that the parties' antagonism will subside over time in the interest of all involved, particularly their children.

**WRIT ANNULLED.**