# IN THE COURT OF APPEALS OF IOWA

No. 14-0317
Filed February 25, 2015

**IN RE THE MARRIAGE OF RICHARD C. MAUER
AND CAROL K. MAUER**

**Upon the Petition of
RICHARD C. MAUER,**
        Petitioner-Appellee/Cross-Appellant,

**And Concerning
CAROL K. MAUER,**
        Respondent-Appellant/Cross-Appellee.
_____

        Appeal from the Iowa District Court for Black Hawk County, Jon Fister,

Judge.


        Carol Mauer appeals, and Richard Mauer cross-appeals, the economic

terms of their dissolution decree.  **AFFIRMED AS MODIFIED ON APPEAL;**

**AFFIRMED AS MODIFIED ON CROSS-APPEAL.**


        Jacob R. Koller of Simmons Perrine Moyer Bergman, P.L.C., Cedar

Rapids, for appellant.

        Allison M. Heffern and Diane Kutzko of Shuttleworth & Ingersoll, P.L.C.,

Cedar Rapids, for appellee.


        Heard by Vogel, P.J., and Doyle and McDonald, JJ.

**DOYLE, J.**

This appeal involves the economic terms of the decree dissolving the marriage of Carol and Richard Mauer. Carol appeals the property distribution and spousal support provisions of the decree; Richard appeals the duration of the spousal support award to Carol. We affirm as modified on appeal and affirm as modified on cross-appeal.

## I.      *Background Facts and Proceedings*

Carol and Richard were married in July 1985. It is the only marriage for either party. At the time of trial in December 2013, Carol was fifty-six years old, Richard was fifty-five years old, and both were in good health. The parties have four children, two of whom were still minors at the time of trial. During their marriage, the parties enjoyed a "wonderful" standard of living.

Richard is an ophthalmologist. He is the sole owner of three closely-held professional corporations: Cedar Valley Ophthalmology (CVO),[1] Mauer Vision Center (MVC), and D'Vine Medical Spa. Richard and Carol co-own Mauer Land, L.L.C., which owns the land and building at 2115 Cyclone Drive in Waterloo where CVO and D'Vine Medical Spa are located. As he did throughout the marriage, Richard works approximately twelve hours per day during the week. Richard earned $755,982, $1,240,655, and $1,443,621 in net income before taxes in 2010, 2011, and 2012, respectively.

Prior to the parties' marriage, Carol graduated from college and received a master's degree in business administration. After the parties were married, Carol

---

[1] Cedar Valley Ophthalmology does business as Mauer Eye Care. We reference it as CVO.

worked for several years as a pharmaceutical representative and computer salesperson while Richard completed his residency. Carol stopped working in 1989, just prior to the birth of the parties' first child. For the ensuing years of the marriage, Carol took care of the children and the home. In 2007, Carol obtained licensure as a massage therapist and began working part-time (approximately twenty-five to thirty hours per week) at D'Vine Medical Spa. She was paid through contributions to a 401K retirement account. According to Carol, a licensed massage therapist working full-time could earn between $33,000 and $38,000. Although Carol indicated she did not have the physical capability to work full-time, she acknowledged plans to start her own massage therapy business.

When they separated in mid-2012, Richard moved out of the marital home. Richard continued to pay all house and living expenses for Carol and the two minor children, as well as tuition and living expenses for the parties' adult children. Richard also agreed to pay Carol the sum of $3200 per month ($1200 for food expenses and $2000 for personal living expenses), which the district court incorporated into a temporary order in December 2012.

In December 2013, the district court entered a decree dissolving the parties' marriage.[2] The court considered the conflicting valuations provided by the parties' experts for the marital residence and the various businesses from

---

[2] The district court entered an order amending various provisions of the decree upon a flurry of motions by the parties after the decree was filed. For our purposes, we review the terms of the decree without distinguishing between whether the provisions were entered initially or entered as amended.

which Richard's income was derived. The court was also tasked with dividing a number of other assets and liabilities of the parties.

As relevant to the issues presented on appeal, the court made the following property valuations and distributions:

|  | Carol | Richard |
|---|---|---|
| CVO |  | $1,020,000 |
| MVC |  | $190,000 |
| D'Vine Medical Spa |  | $0 |
| Mauer Land (net) |  | $97,880 |
| Marital home | $604,000 |  |
| 401K accounts | $831,662 |  |
| 401K account |  | $791,072 |
| Additional assets | $606,808.50 | $1,204,330.50 |
| Liabilities/debts | ($403,633) | ($1,178,641) |
| Equalization payment | $243,458 | ($243,458) |
| **TOTAL** | **$1,882,295.50** | **$1,881,183.50** |

The court ordered Richard to make an equalization payment to Carol in the amount of $243,458, at the rate of $100,000 per year, with interest on the unpaid installments.

The court ordered Richard to pay spousal support to Carol in the amount of $9100 per month until Carol reaches age sixty-six and six months; then $7000 per month until Richard reaches age sixty-six and eight months "or actually retires as a practicing physician, whichever occurs later"; then $5000 per month until "the death of either party." The court also ordered Richard to pay child support in the amount of $3624 per month for the parties' two minor children, and $2598 per month when only one child qualified for support. Finally, the court ordered Richard to pay $19,000 of Carol's attorney fees.

Carol appeals; Richard cross-appeals.

## II.     *Standard of Review*

We review this equity action involving the dissolution of a marriage de novo. Iowa R. App. P. 6.907; *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013). Accordingly, we examine the entire record and decide anew the legal and factual issues properly presented and preserved for our review. *McDermott*, 827 N.W.2d at 676. We give weight to the findings of the district court, particularly concerning the credibility of witnesses; however, those findings are not binding upon us. *Id.*; *see also* Iowa R. App. P. 6.904(3)(g). Only when there has been a failure to do equity will we disturb the district court's ruling. *In re Marriage of Gust*, ___ N.W.2d ___, ___, 2015 WL 200056, at *3 (Iowa 2015).

## III.     *Judicial Bias*

As a preliminary matter, Carol contends the court did not act impartially in this case, but was biased and hostile in dealing with her and her attorney. Carol points to several instances in the trial transcript as evidence the court did not act impartially. Richard counters that Carol failed to preserve error on this claim because she did not raise it in the district court. Indeed, Carol neither challenged the court's statements during trial or in a post-trial motion, nor did she file a motion for recusal.

"Parties have a right to a neutral and detached judicial officer." *In re Marriage of Ricklefs*, 726 N.W.2d 359, 362 (Iowa 2007). On appeal, a party "has the duty to provide a record on appeal affirmatively disclosing the alleged error relied upon." *Id.* (citation and quotation marks omitted). Even if Carol had sought recusal, she was required to show "actual prejudice" before a recusal was necessary. *See McKinley v. Iowa Dist. Ct.*, 542 N.W.2d 822 (Iowa 1996). The

test is objective, "whether a reasonable person would question the judge's impartiality." *Id.* From our review of the entire transcript, we find Carol's claim to be unpersuasive and we affirm on this issue.

## IV. Property Division

Under our statutory distribution scheme, the first task in dividing property is to determine the property subject to division and the proper valuations to be assigned to the property. *In re Marriage of Fennelly*, 737 N.W.2d 97, 100 (Iowa 2007). The second task is division of that property in an equitable manner according to the enumerated factors in Iowa Code section 598.21(5) (2013). *See Fennelly*, 737 N.W.2d at 102. "Although an equal division is not required, it is generally recognized that equality is often most equitable." *Id.* (citation and quotation marks omitted). Ultimately, what constitutes an equitable distribution depends upon the circumstances of each case. *In re Marriage of Hansen*, 733 N.W.2d 683, 702 (Iowa 2007).

Carol challenges the district court's division of property, claiming it is "inequitable due to improper valuations." Specifically, Carol challenges the court's assignments of value of CVO, MVC, D'Vine Medical Spa, Mauer Land, and a Modern Woodmen Life Insurance Policy. Her claims relate to the amount of equalization payment to be paid to her by Richard, which she claims should be $2,570,113 rather than $243,458. Although our review is de novo, we will defer to the district court when valuations are accompanied with supporting credibility findings or corroborating evidence. *See In re Marriage of Vieth*, 591 N.W.2d 639, 640 (Iowa Ct. App. 1999).

*1. CVO and MVC.* The district court valued CVO and MVC at $1,020,000 and $190,000, respectively. Carol proposes values for CVO and MVC of $4,000,000 and $1,000,000. The parties presented dueling experts on the question of how much these business entities were worth. Carol offered the testimony of Dennis Redmond, who primarily used an income approach to value the businesses. Redmond's approach considered the goodwill of the businesses in determining the value, based on his analysis of the businesses' history of profit and prospect of profit. With information through June 2013, Redmond valued CVO at $4,194,000, and MVC at approximately $1,200,000.

Richard offered the testimony of Eric Engstrom, who valued the businesses twice (using information through March 2013 and through August 2013), using both an asset and income approach. With information through March 2013, Engstrom valued CVO at $1,240,000, and MVC at $300,000. With information through August 2013, Engstrom opined the businesses had decreased in value to $970,000 for CVO and $190,000 for MVC. Engstrom believed the downshift was due to changes in healthcare laws. And specifically with regard to MVC, Engstrom noted the recent turnover of its optometrists; Richard testified he was searching for replacement optometrists but may have to close the business.

Carol challenges the court's failure to consider goodwill in determining the valuation of the business entities, and claims CVO and MVC should be valued using income and market approaches advanced by her expert.[3] According to

---

[3] Carol also points to financial statements Richard provided to his lender between 2008 and 2012, which listed his net worth between $10 and $14 million. On this issue, we

Carol, the district court's conclusion that the parties have a marital net worth of approximately $4 million (which was primarily based on its valuation of the business entities) was incorrect and led to an inequitable property distribution. There are several flaws with Carol's claims.

We acknowledge valuing professional practices is difficult because their income flows almost exclusively from the efforts of the professional who owns the business. *See In re Marriage of Bethke*, 484 N.W.2d 604, 607 (Iowa Ct. App. 1992); *In re Marriage of Hogeland*, 448 N.W.2d 678, 681 (Iowa Ct. App. 1989). Here, the district court properly observed that goodwill in a professional practice *is* a marital asset. *See Hogeland*, 448 N.W.2d at 681 ("The good will, if any, of a professional corporation is a factor that bears on the future earning potential of the professional. We consider future earning capacity in considering the equities of the economic provisions of a dissolution."). However, goodwill bears on the professional's future earning capacity (for the purposes of determining alimony), but should not be additionally listed as an asset in the valuation of a professional

---

believe the district court's finding that the exhibits "are not probative of the actual value of a business" is well-founded. As the court explained,

> In connection with the valuation of the businesses and business real estate to be distributed, [Carol] has introduced a series of financial statements that [Richard] has prepared over the years and submitted to the bank that provides his long and short term financing. Exhibits like these are commonly used in cases like this to gain an undeserved advantage over a business loan applicant by exploiting the loan applicant's exaggerations of his or her net worth to convince a lender that he or she is credit worthy. For all practical purposes, there is no reason to believe that net worth statements prepared for the purpose of obtaining credit are much more than negotiating positions. They are not probative of the actual value of a business and, if they are probative of anything, it would be the borrower's perceived necessity of making such representations as the borrower believes are necessary to induce the bank or other lender to extend or continue the financing the borrower is seeking.

We affirm on this issue and adopt the court's reasoning as our own.

practice. See *Hogeland*, 448 N.W.2d at 68; *see also In re Marriage of Bruns*, No. 10-0864, 2011 WL 237969, at *3 (Iowa Ct. App. Jan. 20, 2011).

The district court specifically stated it would consider the goodwill of the business entities in determining the spousal support to be paid by Richard to Carol. The court further noted it found Richard's expert provided a more credible approach for valuing the businesses via the asset approach.[4] As the court stated:

> [Richard's] expert primarily relies on the asset approach to the valuation of CVO and MVC. [Carol's] expert primarily relies on the income approach. Because [Richard's] earning capacity will be accounted for in setting spousal support, it would be improper to count it twice by using the income approach to value the corporations. On the issue of which is the best method for valuing closely held professional corporations, the court finds [Richard's] expert more credible. . . .
> [Specifically with regard to MVC, the] biggest reason, but not the only reason, for the difference [in the experts' valuations] is that [Carol's] expert did not adjust the value of MVC's receivables downward to account for MVC's 60% collection rate. For this reason, and because [Carol's] expert seems to have ignored serious problems with MVC's staffing and decline in income when he valued MVC by the income approach, the court finds that the valuation submitted by [Richard's] expert is more realistic and that the value for MVC should be fixed at $190,000. This may be a conservative valuation, but there is credible evidence that MVC is clearly not the same business in 2013 as it was in 2012 and prior years and it is just as likely [Richard] will close its doors to cut his losses as it is that it will return to its previous profitability.

The district court's decision to assign values of $1,020,000 and $190,000 to CVO and MVC was within the permissible range of evidence, and we will not

---

[4] Specifically with regard to CVO, Carol claims Engstrom's valuation was not credible because he "assigned an unreasonably high salary" to Richard—increasing it to $900,000—which was higher than Richard's current wage of $500,000, and significantly higher than his three-year average salary of $324,000. Carol's concerns with regard to Richard's salary will be addressed below in our review of the amount of spousal support the court awarded.

disturb it on appeal. *See Hansen*, 733 N.W.2d at 703 ("[A] trial court's valuation of an asset will not be disturbed when it is within the permissible range of evidence.").

2. *D'Vine Medical Spa.* The district court valued D'Vine Medical Spa at $0. At trial, the parties essentially agreed D'Vine had a value of $0, and debts in the amount of $390,000. On appeal, Carol does not challenge that valuation, but instead claims D'Vine may have value in the future. Because the district court is tasked with ascertaining the value of property as of the date of trial, *see In re Marriage of Keener*, 728 N.W.2d 188, 193 (Iowa 2007) ("The assets should then be given their value as of the date of trial."), we affirm on this issue.

3. *Mauer Land.* The district court valued Mauer Land at $3,700,000. Carol proposes a value for Mauer Land of $4,000,000. In reaching its valuation, the district court considered evidence of several appraisals of the property presented by parties valuing the property at $3,400,000 and $4,000,000, as well as a negotiated settlement between Richard and the Board of Review assessing the property at $3,600,000. The court also noted:

> There is some evidence that the property is overbuilt for its highest and best use with finishes and materials whose cost would not be recovered if the building were sold. There is also evidence that the unfinished area of the building has remained vacant since the building was constructed and the space occupied by D'Vine is effectively vacant because it is unable to pay anything towards rent, taxes, and so forth. What this suggests is that because of its location, layout or some other factors which the appraisers have not appreciated, the income generated by this property will continue to be less than projected and the property cannot be sold for its highest and best use or anything near the cost to replace it.

Ultimately, the court found "Mauer Land is worth somewhere between $3,400,000 and $4,000,000 and fixe[d] its value at $3,700,000." We conclude

the district court's valuation of Mauer Land was within the range of the evidence and, as a result, should not be disturbed.

*4. Modern Woodmen Life Insurance Policy.* Carol claims Richard dissipated marital assets by cashing in a life insurance policy during the proceedings. The district court addressed this issue in its ruling, noting Richard had used the cash value of the life insurance policy to reduce CVO's liabilities. As the district court stated:

> [T]he value of CVO as of August 31, 2013, is between $970,000 and $999,857, with an adjustment for changes in CVO's liabilities since the valuations. Between August 31 and December 3, 2013, CVO's liabilities grew by $243,275 but were more than offset by credits for the $247,283 cash value of the life insurance policy [Richard] surrendered and applied to CVO's liabilities plus an additional payment of $30,582. [Carol] has argued that the cash value of the insurance policy should not have been applied to reduce CVO's liabilities, that it should be charged to [Richard] as a dissipated marital asset and that the value of CVO should not be adjusted for the liabilities incurred since the August 31 valuation. This argument, if adopted, would incorrectly and improperly inflate [Richard's] share of the marital estate by over $490,000 because [Richard] is personally liable for CVO's liabilities and CVO would be worth $247,000 less if the liabilities had not been reduced. Reduction of CVO's liabilities also benefits the marital estate by reducing the interest on the outstanding debt. In any event, when the additional debt is added to CVO's liabilities and the credits are subtracted, CVO's value is increased by $34,590.[5]

The district court's decision on this issue was within the permissible range of evidence, and we will not disturb it on appeal.

After a careful review of the evidence, we find the district court's valuations of property and property distribution was equitable. *See Vieth*, 591

---

[5] We disagree with Carol's additional assertion that the district court "assigned a value of $34,590 to the policy." As the court observed, between August 31 and December 3, 2013, CVO's liabilities grew by $243,275, to which Richard made a payment of $30,582 and applied the cash value of the life insurance policy of $247,283; accordingly, the court determined the *value of CVO* had increased by $34,590.

N.W.2d at 641 ("[W]e give strong deference to the trial court which, after sorting through the economic details of the parties, made a fair division supported by the record."). We affirm on this issue.

## V. Amount of Spousal Support

The district court ordered Richard to pay spousal support to Carol in the amount of $9100 until Carol reaches age sixty-six and six months; then $7000 per month until Richard reaches age sixty-six and eight months "or actually retires as a practicing physician, whichever occurs later"; then $5000 per month until "the death of either party." Carol claims the court's spousal support order is inequitable. She requests $25,000 per month until she reaches age sixty-six and six months; then $15,000 per month until Richard reaches age sixty-six and eight months or fully retires as a practicing physician; then $10,000 per month until the death of either party.

Spousal support is not an absolute right—it depends upon the circumstances of a particular case. *In re Marriage of Schenkelberg*, 824 N.W.2d 481, 486 (Iowa 2012). The court may grant an award of spousal support after consideration of all the factors contained in Iowa Code section 598.21A(1). *Gust*, ___ N.W.2d ___, ___, 2015 WL 200056, at *4-5. Even though our appellate review of spousal support awards is de novo, we accord the district court considerable discretion in such determinations and will disturb the district court ruling only where it fails to do equity between the parties. *In re Marriage of Kurtt*, 561 N.W.2d 385, 388 (Iowa Ct. App. 1997).

The parties were married for twenty-eight years, during which Richard developed a successful ophthalmology practice and Carol was a homemaker and

caretaker for the children. Carol received substantial liquid investments and cash, and responsibility for little debt, in the property distribution. Both Richard and Carol are in their fifties and in good health. The parties agree Carol is educated, but her earning capacity is significantly less than Richard's. There is no question Carol should receive spousal support.

There are different kinds of support, but this case involves traditional spousal support. *See, e.g., Gust*, ___ N.W.2d ___, ___, 2015 WL 200056, at *12 (affirming the district court's award of traditional spousal support to wife where "the marriage was of long duration, nearly twenty-seven years," the wife "spent many years as a stay-at-home mom," the wife's "economic prospects [we]re limited," and "spousal support would be necessary for her to live in a fashion approaching her lifestyle during the marriage"). "The purpose of a traditional or permanent alimony award is to provide the receiving spouse with support comparable to what he or she would receive if the marriage continued." *In re Marriage of Hettinga*, 574 N.W.2d 920, 922 (Iowa Ct. App. 1997). "Traditional support is ordinarily of unlimited or indefinite duration." *Gust*, ___ N.W.2d ___, ___, 2015 WL 200056, at *5.

Carol points out that she "spent a great deal of time" creating her monthly budget and list of expenditures. Carol submitted a budget of $23,052 at trial. The district court found Carol's monthly budget to be excessive compared to her actual expenses, as do we. However, we conclude Carol will need more than the court's award of $9100 per month to live in a fashion comparable to her lifestyle during the marriage.

Richard is a successful physician and there is no doubt he has an ability to pay spousal support to Carol, who is in need of support. Considering the evidence submitted by Richard detailing his annual income over the past several years, we believe Richard can be expected to earn at least $1,000,000 per year in gross income.[6]

Even though Carol had not generally worked during the parties' marriage, she testified a licensed massage therapist working full-time could earn $33,000 to $38,000 per year. She also acknowledged she was starting her own massage and therapy business. Carol further testified, however, she was not physically able to work full-time giving massages. Although the district court determined "there is no reason to believe that her future employment, if any, would be anything more than a hobby," in light of Carol's own testimony on the subject, we believe she can be expected to earn $25,000 per year.

We further note Carol's testimony that the marital home is large, requires a lot of work to maintain, and her primary motivation for keeping it was because the children wanted her to. Soon there will be no minor children living at home, and Carol could downsize without decreasing her quality of life, as the court noted Richard had done in purchasing a condominium half the price of the marital home. Although the district court acknowledged these potential future variances in Carol's earnings and expenses could decrease Carol's support needs, the court did not rely on them in determining the amount of the support award and neither do we.

---

[6] We note this amount is also in line with Richard's expert's testimony in regard to his opinion of the amount of Richard's salary in valuing his business entities.

In reaching its decision with regard to the amount of support, the district court considered the amount of temporary support Richard had been paying Carol up to trial coupled with the additional expenses Richard had been paying for the benefit of Carol and the children, and determined, "With investment income [from the property distribution] and over $3600 per month in child support, it should take not quite $8,000 per month after taxes to make up the difference." As we stated above, although many of the expenses claimed by Carol were "overstated" (such as her listings for gasoline, food, cell phone, home repairs, and lawn care), and her budget included many items she was not paying at the time of trial and would not be required to pay after the dissolution (such as housekeeping expenses, acupuncture, grand piano payments, tuition and living expenses for the adult children, a car payment, the children's car insurance and registration, life insurance, and figure skating lessons), clearly Carol was accustomed to a standard of living well above the amount of the court's support award.

A district court has considerable latitude when making an award of spousal support. *Schenkelberg*, 824 N.W.2d at 486. We will disturb the court's ruling only when there has been a failure to do equity. *Id.* Such deference is decidedly in the public interest. *In re Marriage of Benson*, 545 N.W.2d 252, 257 (Iowa 1996). "When appellate courts unduly refine these important, but often conjectural, judgment calls, they thereby foster appeals in hosts of cases, at staggering expense to the parties wholly disproportionate to any benefit they might hope to realize." *Id.*

Upon our de novo review, we believe the district court's award of $9100 per month fails to do equity in this case. We conclude that awarding Carol her request for $25,000 per month in spousal support would achieve equity between the parties.[7] And with regard to the step-decreases of the court's spousal support order, we further conclude that considering the speculative issues raised by Richard's future retirement (e.g., we do not know when Richard will actually retire, the relative financial positions of the parties at the time of his eventual retirement, or whether he will maintain any type of his practice to enhance his retirement income), the effect of Richard's future retirement on the amount of the support award is a question that can be raised in a potential future modification action. *See Gust*, ___ N.W.2d ___, ___, 2015 WL 200056, at *14 ("The most consistent approach with the statutory scheme is that unless all of the factors in Iowa Code section 598.21C(1) can be presently assessed, future retirement is a question that can be raised only in a modification action subsequent to the initial spousal support order."). We modify the decree in this regard.

---

[7] We observe our resolution on this issue is consistent with the recommendation of the American Academy of Matrimonial Lawyers (AAML). *See Gust*, ___ N.W.2d ___, ___, 2015 WL 200056, at *17 n.2 (citing Mary Kay Kisthardt, *Re-thinking Alimony: The AAML's Considerations for Calculating Alimony*, *Spousal Support*, *or Maintenance* 21 J. Am. Acad. Matrim. Law. 61, at 80-85 (2008) (urging calculation of unlimitied spousal support for marriages over twenty years by taking thirty percent of the payor's gross income minus twenty percent percent of the payee's gross income)). In this case, application of the AAML guideline formula would produce a presumptive unlimited support payment of $295,000 per year. "The AAML guidelines, of course, are not Iowa law, but the similarity between the AAML guidelines and our application of Iowa Code section 598.21A(1) factors is apparent." *Gust*, ___ N.W.2d ___, ___, 2015 WL 200056, at *17 n.2 (stating the AAML guidelines "provide a useful reality check with respect to an award of traditional spousal support").

### VI.     *Duration of Spousal Support*

In his sole cross-appeal issue, Richard challenges the district court's award of lifetime spousal support to Carol.

Richard claims his spousal support obligation should terminate when he reaches age sixty-six and eight months or actually retires, whichever is later.  In the alternative, Richard claims his spousal support should terminate upon Carol's remarriage.  We have addressed the retirement issue above; we proceed to the issue of Carol's potential remarriage.

A court may order spousal support for a limited or indefinite period of time.  Iowa Code § 598.21A(1).  Support can continue beyond the parties' anticipated dates of retirement, and the amount of support can be reduced over time.  *In re Marriage of Bell*, 576 N.W.2d 618, 623 (Iowa Ct. App. 1998), *overruled on other grounds by In re Marriage of Wendell*, 581 N.W.2d 197, 200 (Iowa Ct. App. 1998).  Considering the circumstances in this case, we conclude the district court's award of spousal support to Carol until the death of either party was equitable.  *See Gust*, ___ N.W.2d ___, ___, 2015 WL 200056, at *9 (noting "an award of traditional spousal support is normally payable until the death of either party").

We conclude, however, equity requires termination of spousal support if Carol remarries where Carol has shown no "extraordinary circumstances" to justify the continuation of support beyond remarriage in this case.  *See, e.g.*, *In re Marriage of Wendell*, 581 N.W.2d 197, 199 (Iowa Ct. App. 1998) ("[A]lthough subsequent remarriage does not automatically terminate an alimony obligation, it does shift the burden to the recipient to show 'extraordinary circumstances' to

justify its continuation."); *see also Gust*, ___ N.W.2d ___, ___, 2015 WL 200056, at *12 ("[T]raditional spousal support is ordinarily unlimited in duration *except upon the remarriage of the payee spouse*, or death of either party." (Emphasis added)). We modify the decree in this respect.

## VII.   Child Support

The district ordered Richard to pay child support in the amount of $3624 per month for the parties' two minor children, and $2598 per month when only one child qualified for support. Noting Richard's net monthly income exceeds $25,000, Carol claims equity requires Richard pay $9425 per month for two children and $6760 per month for one child.

Under Iowa Court Rule 9.26, when combined net monthly income exceeds $25,000, "the amount of the basic support obligation is deemed to be within the sound discretion of the court . . . but shall not be less than the basic support obligation for combined net monthly incomes equal to $25,000." Further, Iowa Court Rule 9.3 recognizes the general purpose of child support is "to provide for the best interests of the children by recognizing the duty of both parents to provide adequate support for their children in proportion to their respective incomes. While the guidelines cannot take into account the specific facts of individual cases, they will normally provide reasonable support."

The district court explained its decision not to exceed the minimum child support provided by the guidelines as follows:

> According to the testimony of both parties, the children are happy, well adjusted, have no special needs and are in good physical and mental health. They are both active and accomplished in both educational and extracurricular activities. Moreover, [Carol's] Affidavit of Financial Status lists not

extraordinary expenses peculiar to either of the children. In addition, [Richard] will be paying for their health insurance, car registrations, car insurance and other expenses directly. For these reasons, the court finds no reason to order more child support than the minimum required by rule and that doing so would indirectly and unnecessarily augment [Carol's] spousal support.

Under the specific facts of this case, we conclude the amount of the basic support obligation ordered was within the sound discretion of the court. *See* Iowa Ct. R. 9.26. We affirm on this issue.

## VIII. *Life Insurance*

The district court declined Carol's request to order Richard to maintain a life insurance policy with Carol as beneficiary to secure his support obligations. Carol reiterates her request on appeal.

A requirement to maintain life insurance to secure spousal support is permissible. *See In re Marriage of Olson*, 705 N.W.2d 312, 318 (Iowa 2005). The court may order the security of a life insurance policy where the party requesting the security has demonstrated a need and the cost of such a policy would not be unduly burdensome. *See id.*; *see also In re Marriage of Muow*, 561 N.W.2d 100, 102 (Iowa Ct. App. 1997).

Richard claims this record is inadequate to support a finding that a life insurance policy is appropriate in this case. We agree this record contains little information regarding evidence of insurability, costs, and reason for imposing such a requirement. *See id.* at *10. In any event, the district court ruled on the issue, and determined Richard was not required to obtain life insurance for his support obligations. We conclude the district court's ruling was within its sound discretion and affirm on this issue.

### IX.     *Appellate Attorney Fees*

Carol seeks an award of $10,000 in appellate attorney fees. Such an award is discretionary. *In re Marriage of Berning*, 745 N.W.2d 90, 94 (Iowa Ct. App. 2007). Considering the successful issues raised by both parties in their respective appeals as well as their respective abilities to pay attorney fees, we decline to award attorney fees to Carol.

### X.     *Conclusion*

We modify the decree to order Richard to pay spousal support to Carol in the amount of $25,000 per month until her remarriage or the death of either party, reserving the question of whether Richard's spousal support should be modified upon his retirement to be raised in a modification action when retirement is imminent or has actually occurred.

Costs of appeal are assessed one-half to each party.

**AFFIRMED AS MODIFIED ON APPEAL; AFFIRMED AS MODIFIED ON CROSS-APPEAL.**