STATE of Iowa, Appellee,

v.

Douglas Warren BIDDLE, Appellant.

No. 01–1434.

Supreme Court of Iowa.

Oct. 9, 2002.

Linda Del Gallo, State Appellate Defender and Stephan J. Japuntich, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Sharon K. Hall, Assistant Attorney General, James Detaeye, Marshall County Attorney, and David S. Walker, Assistant County Attorney, for appellee.

LAVORATO, Chief Justice.

A jury convicted defendant, Douglas Warren Biddle, for delivery of methamphetamine, more than five grams, in violation of Iowa Code section 124.401(1)(b)(7) (1999). Biddle appeals from his conviction and sentence. In his appeal, Biddle chal-

lenges the district court's rulings (1) allowing into evidence the methamphetamine he was accused of delivering and a lab report regarding the drug over his chain-of-custody objection, (2) denying his motion for judgment of acquittal based upon insufficiency of the evidence, (3) denying his motion for new trial based on his allegation that the district court failed to act in a neutral and detached manner, and (4) rejecting his constitutional challenges to Iowa Code sections 901.10(2) and 907.3(3)(e). We preserve for postconviction relief proceedings Biddle's claim that his counsel was ineffective for failing to raise in district court the application of strict scrutiny to Biddle's equal protection claim. We find the remainder of Biddle's challenges without merit and therefore affirm.

## I. Facts.

The jury could find the following facts. On October 31, 2000, Detective James Ulin, an officer with the Marshalltown Police Department and the Mid–Iowa Drug Task Force (Drug Task Force), set up a controlled buy of narcotics from Biddle. Previously, Ulin had observed Biddle at the residence of a known drug dealer. Based on his observations, Ulin suspected that Biddle might be involved in narcotics.

Confidential informant Tracy Cartee had an agreement with the Drug Task Force whereby pending charges against him in Story County, Iowa, would be dismissed in exchange for his cooperation. The Drug Task Force expected Cartee to set up two targets and buy approximately two "eight-balls" (⅛ of an ounce) of methamphetamine. Cartee, a methamphetamine user, informed Ulin that he had previously purchased drugs from Biddle.

On October 31, 2000, Ulin instructed Cartee to call Biddle and arrange to buy drugs from him. Cartee called Biddle and

arranged to meet him at Wal–Mart to purchase $350 worth of methamphetamine, approximately a quarter of an ounce.

Before the meeting, Cartee and his girlfriend, Terri Norton (who was also under an agreement with the Drug Task Force), met Ulin and Deputy Hoffman at Lions Park to prepare for the controlled buy. Ulin performed a pat-down search of Cartee, checking his pockets and waistband. Ulin checked the amount of cash Cartee was carrying and opened Cartee's package of Camel Light cigarettes to look inside and verify that only cigarettes were there. According to Cartee, the officers searched his pockets, shirt, coat, boots, waistline, billfold, motorcycle, and motorcycle pouch. Cartee noted that the only place to carry anything on his motorcycle was in the leather pouch attached to the front.

According to Ulin, officers typically do not search the metal part of a motorcycle engine, or inside a person's shoes because methamphetamine will melt in places that get exceedingly hot.

At the same time that Ulin was searching Cartee, Hoffman was searching Norton. Ulin and Hoffman had searched Cartee and Norton on a prior occasion. Hoffman and Norton were approximately three feet from Ulin and Cartee. Cartee did not closely watch Hoffman's search of Norton. The officers found no controlled substances on Cartee, Norton, or the motorcycle. Following the search, Ulin placed a transmission wire on Cartee and provided him with the money to make the drug buy.

At 4:33 p.m., Cartee and Norton left the park on Cartee's motorcycle and headed for Wal–Mart to meet Biddle. Ulin and Hoffman followed them. Cartee and Norton arrived at Wal–Mart at 4:39 p.m. On the way to Wal–Mart, the officers saw no

furtive movements by either Cartee or Norton.

Deputy William Jorgensen followed Biddle, who was on a motorcycle, to the Wal–Mart parking lot. Cartee and Norton arrived before Biddle. Officer Matthew Hoskins, who was responsible for recording any conversations picked up by Cartee's wire, was parked in the Wal–Mart parking lot when Biddle arrived at about 4:44 p.m.

While Biddle, Cartee, and Norton were talking, a police officer drove a marked police car through the Wal–Mart parking lot. This officer's presence was unrelated to the controlled buy. Biddle "got spooked by the cop" and told Cartee and Norton to follow him to another location to complete the drug transaction.

Cartee and Norton followed Biddle to Brown & Sons Camper Sales (Brown & Sons). They did not stop anywhere on the way. Cartee and Norton arrived at Brown & Sons at 4:52 p.m. Ulin estimated it takes three or four minutes to get from Wal–Mart to Brown & Sons. In the parking lot, Cartee and Norton gave Biddle the money, and Biddle handed Cartee the drugs in a GPC cigarette pack. Biddle told Cartee and Norton that he could get one more quarter ounce if they wanted it. They told Biddle they would contact him. Biddle left, and Cartee and Norton returned directly to Lions Park.

Jorgensen, Hoskins, and Ulin separately followed the motorcycles from Wal–Mart to the Brown & Sons lot and parked nearby. None of the officers observed any furtive movements by Cartee or Norton along the way. Hoskins lost sight of them for a short time. Ulin could not see Cartee, Norton, or Biddle once they got to the Brown & Sons parking lot. Cartee's wire picked up his and Norton's conversation with Biddle. The tape, however, was muffled and hard to hear. Ulin next saw Cartee and Norton when they exited the Brown & Sons parking lot and headed back to Lions Park. Ulin followed them directly to the park and did not observe any furtive movements along the way. Cartee and Norton arrived at the park at 5:04 p.m.

At the park, Ulin received an empty pack of cigarettes with a "brown chunk powder substance" inside. According to Cartee, Ulin retrieved the pack from Norton's pocket. However, according to Ulin, Cartee handed him the pack. Ulin and Hoffman searched Cartee and Norton again at 5:05 p.m. Cartee no longer had the money that Ulin had provided earlier. Thirty-eight minutes passed between the prebuy and postbuy searches. Ulin observed Cartee and Norton the entire time, except for approximately three to seven minutes during which Cartee and Norton were talking with Biddle in the Brown & Sons parking lot.

## II. Proceedings.

On February 12, 2001, the State charged Biddle with delivery of more than five grams of methamphetamine, in violation of Iowa Code section 124.401(1)(b)(7). At trial, Cartee identified the package of methamphetamine he purchased from Biddle. According to a lab report, the package contained 6.67 grams of methamphetamine. Biddle objected to the introduction of the methamphetamine and the lab report on chain-of-custody grounds. After some discussion, the court admitted the challenged evidence.

At the close of the State's case, Biddle moved for judgment of acquittal, arguing that the State had not proved its case due to the chain-of-custody issue. The district court denied the motion. The jury found Biddle guilty of delivery of more than five grams of methamphetamine.

In his motion for new trial, Biddle argued that the district court failed to act in a neutral and detached manner when it "assist[ed] the State by outlining the specific steps needed to overcome the chain-of-custody objection." The court denied the motion.

Before he was sentenced, Biddle raised constitutional challenges to Iowa Code sections 901.10(2) and 907.3(3)(e). The district court denied the challenges and proceeded to sentence Biddle to an indeterminate twenty-five-year term of imprisonment. Biddle appeals.

### III. Issues.

Biddle raises several issues on appeal. First, he argues the district court erred in admitting the cigarette pack containing the methamphetamine and the lab report over his chain-of-custody objection. Second, Biddle argues the district court erred in failing to grant his motion for judgment of acquittal based on insufficiency of the evidence. Third, he contends the district court erred in failing to grant him a new trial based on the court's failure to act in a neutral and detached manner. Last, he argues the district court erred in denying his constitutional objections to Iowa Code sections 901.10(2) and 907.3(3)(e). In the event that any of these issues were not adequately preserved, Biddle argues his trial counsel was ineffective in not preserving them.

### IV. Chain–Of–Custody Issue.

 The district court has considerable discretion in determining whether the State has shown the chain of custody necessary for admission of physical evidence. *State v. Barger*, 511 N.W.2d 632, 636 (Iowa Ct.App.1993). We review admission of such evidence over a chain-of-custody objection for abuse of discretion. *State v. Bakker*, 262 N.W.2d 538, 543 (Iowa 1978).

Unless there is a clear abuse of discretion in such a ruling, we will not overturn it. *Id.*

Biddle contends the State's failure to produce Norton as a witness at trial is a "fatal flaw" in proving chain of custody. Norton, Biddle argues, had an incentive to hide all or part of the methamphetamine allegedly purchased from Biddle before the alleged transaction, because she had some pending charges that would be dropped if she cooperated in this controlled buy. In addition, Biddle contends the Drug Task Force failed to provide a female law enforcement officer to search Norton before the controlled buy. Finally, Biddle contends that none of the officers witnessed the transaction, thus providing Norton with ample time to change and/or tamper with the methamphetamine. For these reasons, Biddle argues that the evidence is "highly unreliable," and the district court therefore should not have admitted it.

 It is true that "[f]ailure to account for continuous custody or to negate any reasonable probability of tampering or substitution of evidence ordinarily is fatal to the State's case." *Id.* at 542. However, to establish a chain of custody adequate to justify admission of physical evidence, the State must show only "circumstances making it reasonably probable that tampering, substitution or alteration of evidence did not occur. Absolute certainty is not required." *Id.* at 542–43. The burden is heavier when the evidence offered is an item that is very susceptible to tampering, like drugs. *State v. Mehner*, 480 N.W.2d 872, 877 (Iowa 1992). When the district court has determined that the State has established a sufficient foundation for the admission of the physical evidence, any speculation to the contrary affects the weight and not the admissibility of the

evidence. *State v. Orozco*, 290 N.W.2d 6, 10 (Iowa 1980).

In this case, we think the testimony of the State's witnesses was sufficient to establish the chain of custody. As both Ulin and Cartee testified, Ulin conducted a thorough search of Cartee just before the controlled buy at 4:27 p.m. Deputy Hoffman, a male officer, searched Norton, a female. Ulin testified a male officer could conduct a thorough search of a female, "but minus, of course, the female cavities." In a situation like the one here, Ulin testified that a male could search a female with another male officer present, "as long as there were the two of us." Ulin and Hoffman had searched Cartee and Norton on a prior occasion, and Ulin testified that he had confidence in Hoffman's search of Norton. Hoffman searched Cartee's motorcycle, including the leather pouch attached to it. Ulin testified he "had no doubt" in his mind that there were no drugs on Cartee, Norton, or the motorcycle when they left the park at 4:33 p.m., en route to Wal-Mart.

Except for between three and seven minutes, during which the alleged transaction took place, officers observed Cartee and Norton during the operation and did not notice any furtive movements. Ulin received the pack of cigarettes with the methamphetamine at 5:04 p.m. from either Cartee or Norton. At 5:05 p.m., Ulin and Hoffman conducted another search of Cartee and Norton and found nothing. The entire controlled buy operation took less than forty minutes.

Cartee, who had been dating Norton for approximately ten months, testified that Norton would have told him if she had any methamphetamine on her that day. He observed Norton put the methamphetamine she received from Biddle in her pocket and give it to Ulin. Cartee testified there was no way Norton could have al-

tered the drug after receiving it from Biddle and before meeting the officers in Lions Park. He also testified he would have known if she made any movements while riding on the motorcycle with him. Finally, Cartee identified the methamphetamine the State was attempting to offer into evidence as the methamphetamine received from Biddle.

We conclude the State adequately showed "circumstances making it reasonably probable that tampering, substitution or alteration of evidence did not occur." *Bakker*, 262 N.W.2d at 543. Any speculation to the contrary affected only the weight of the evidence and not its admissibility. *See United States v. Beal*, 279 F.3d 567, 571–72 (8th Cir.2002) (although officers may not have been able to see actual drug transaction occur and informant did not testify, chain of custody established where officer searched informant before controlled buy; transaction occurred in car on a public street, lasted less than one minute; and informant was under constant surveillance by several officers who communicated by radio to ensure their surveillance was not compromised).

## V. Sufficiency of Evidence.

We review challenges to the sufficiency of the evidence supporting a guilty verdict for correction of errors at law. *State v. Webb*, 648 N.W.2d 72, 75 (Iowa 2002). We allow a verdict to stand if substantial evidence supports it. *Id.* Evidence is substantial if it would convince a rational fact finder that the defendant is guilty beyond a reasonable doubt. *Id.* at 75–76.

We review the evidence in the light most favorable to the State, including legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence. *State v. Heard*, 636 N.W.2d 227, 229 (Iowa 2001). We consider

all the record evidence, not just the evidence that supports the verdict. *Id.*

Biddle's sufficiency-of-the-evidence argument directly relates to his chain-of-custody argument. Biddle contends that, because the chain of custody was deficient as to the methamphetamine, the State did not prove beyond a reasonable doubt that he supplied Cartee and Norton with the drug or, in the alternative, five grams or more of it. Because we determine the district court did not abuse its discretion in admitting the methamphetamine over Biddle's chain-of-custody objection, we conclude substantial evidence supports the jury's guilty verdict.

## VI. Neutral and Detached Judge.

The State contends Biddle failed to preserve error on this issue by objecting or moving for recusal at the time the district court allegedly improperly aided the prosecution in laying foundation for the admission of the methamphetamine and the lab report concerning it. *See McKinley v. Iowa Dist. Ct.*, 542 N.W.2d 822, 827 (Iowa 1996) (counsel "promptly filed a motion to recuse" after judge's comments in open court). To the extent Biddle failed to preserve error, he argues his trial counsel was ineffective.

Biddle first raised the issue in a motion for new trial. Clearly, that was too late. However, we need not reach the ineffective-assistance-of-counsel issue if we determine the district court did not improperly aid the prosecution on the chain-of-custody issue. *See State v. Phillips*, 610 N.W.2d 840, 844 (Iowa 2000) ("Because we have rejected all of Phillips' arguments on their merits, we need not address the claim of ineffective assistance of counsel she has raised to excuse her trial counsel's failure to preserve error in the district court.").

■ ■ There is a constitutional right to have a neutral and detached judge. *State v. Mann*, 512 N.W.2d 528, 532 (Iowa 1994). "A judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned...." Iowa Code of Judicial Conduct, Canon 3C(1). Before recusal is necessary, actual prejudice must be shown. *McKinley*, 542 N.W.2d at 827. "The test is whether a reasonable person would question the judge's impartiality." *Id.* Speculation is not sufficient, and "there is as much obligation for a judge not to recuse when there is no occasion for him to do so as there is for him to do so when there is." *Mann*, 512 N.W.2d at 532 (citation omitted). The burden of showing grounds for recusal is on the party seeking it. *Id.*

■ ■ As mentioned, Biddle objected to the introduction of the drugs allegedly delivered to Cartee and Norton on chain-of-custody grounds. The district court, after considering the arguments of the parties, explained to them—outside the jury's presence—that it would overrule a chain-of-custody objection "if there was evidence in the record with respect to the time durations of the periods when the confidential informants were under surveillance."

After the State presented additional testimony and again moved to admit the methamphetamine and the lab report, the court summoned both attorneys to the bench. During this conference—outside the hearing of the jury—the court recalled telling the prosecutor, "you know what you have to do if you're going to get this evidence in; and if you cannot do that, then let's move on." The prosecutor recalled the conversation similarly: "[The judge] told me basically let's move on unless we're going to get the information we need." Following the bench conference, the State presented additional testimony,

and the court eventually admitted the challenged evidence. Biddle contends the court improperly advised the State how to remedy its foundational deficiencies, which demonstrates the court's failure to act in a neutral and detached manner.

■ A judge is allowed to manage the trial, including the order of proof. *Howard v. State,* 766 S.W.2d 907, 908 (Tex.Ct. App.1989). In *Howard,* the appellate court concluded that the trial judge's suggestion of a procedure that it would consider acceptable to support the admission of fingerprint records was not an abuse of discretion. *Id.*

The district court's ruling on Biddle's motion for new trial concerning this very issue more than adequately explains the court's action and dispels any notion of judicial bias in favor of the State and a lack of neutrality on the part of the court:

> In the instant case this Court believes it was well within its discretion to advise the parties during its ruling on the objection (which by request was being treated as a motion in limine) as to what it believed was lacking in the State's chain of custody proof. Or placed conversely, this Court believes it had discretion to tell the State what was necessary to establish the appropriate foundation. It was up to the State to produce the evidence to meet those foundational requirements. If it could not do so, the drugs and the lab report would not have been admitted.
>
> . . . .
>
> Even if the Court had not pointed out to the State where its foundation evidence was lacking, it would have been Defendant's responsibility to do so, in order to preserve error.
>
> A chain of custody objection is in essence an objection challenging the foundational basis to admit the exhibit. That being the case, had the State of-

fered the drugs without a proper foundation, the Defendant would have been obliged, in order to preserve error, to illuminate the specific reasons why the foundation was deficient. "A party objecting to the offer of evidence for this reason [no proper foundation laid] must point out in what particular or particulars the foundation is deficient so the adversary may have an opportunity to remedy the alleged defect, if possible."

> Accordingly, insofar as the Court's initial pronouncement about what type of foundation it considered necessary to admit the drugs, the Court is unconcerned that it overstepped the bounds of discretion, thereby coming to the State's aid in its case presentation.

(Citations omitted.)

Additionally, all of the district court's comments were *outside* the presence of the jury. The court was very careful to make sure no arguments or any response by the court were made in the jury's presence. *Cf. State v. Hardy,* 492 N.W.2d 230, 235 (Iowa Ct.App.1992) ("Jurors are particularly sensitive to the presiding judge's views and may be unduly influenced by what they perceive those views to be."). No reasonable person would question this trial judge's impartiality during trial. *Cf. State v. Glanton,* 231 N.W.2d 31, 34–36 (Iowa 1975) (trial judge "assumed the partisan role of advocate for the defense" by directing defense counsel when and how to make objections and interposing objections of his own). We conclude the district court did not improperly aid the State on the chain-of-custody issue. Because we reach this conclusion, we need not address the ineffective-assistance-of-counsel issue.

## VII. Constitutional Issues.

Biddle argues, as he did in the district court, that Iowa Code section 901.10(2)

violates his right against self-incrimination and his right to a jury trial as guaranteed by the Fifth and Sixth Amendments of the United States Constitution and article I, sections 9 and 10 of the Iowa Constitution. In addition, he contends Iowa Code sections 901.10(2) and 907.3(3)(e) violate equal protection.

We review constitutional issues de novo. *In re S.J.D.*, 641 N.W.2d 794, 797 (Iowa 2002). Because statutes are cloaked with a strong presumption of constitutionality, a party challenging a statute as unconstitutional carries a heavy burden of rebutting this presumption. *Id.* Such a party must negate every reasonable basis upon which the court could hold the statute constitutional. *Klouda v. Sixth Judicial Dist. Dep't of Corr. Servs.*, 642 N.W.2d 255, 260 (Iowa 2002). Such a party must also show beyond a reasonable doubt that a statute violates the constitution. *Id.*

The jury convicted Biddle of delivery of more than five grams of methamphetamine, a violation of Iowa Code section 124.401(1)(b)(7). He was therefore subject to the Iowa Code section 124.413 mandatory minimum sentence:

A person sentenced pursuant to section 124.401, subsection 1, paragraph . . . "b," . . . shall not be eligible for parole until the person has served a minimum period of confinement of one-third of the maximum indeterminate sentence prescribed by law.

Iowa Code § 124.413.

Because the offense involved methamphetamine, Biddle was also subject to section 901.10(2), which provides in relevant part:

[I]f the sentence under section 124.413 involves a *methamphetamine* offense under section 124.401, subsection 1, paragraph "*a*" or "*b*", the court shall not grant any reduction of sentence *un-less the defendant pleads guilty*. If the defendant pleads guilty, the court may, at its discretion, reduce the mandatory minimum sentence by up to one-third.

Iowa Code § 901.10(2) (emphasis added). Biddle did not plead guilty. Therefore, the sentencing court had no discretion to reduce his sentence.

Finally, pursuant to Iowa Code section 907.3(3)(e), the sentencing court could not suspend Biddle's sentence and place him on probation. *See* Iowa Code § 907.3(3)(e) (providing that the court shall not suspend the sentence and place defendant on probation if the offense is a violation of section 124.401(1)(a) or (b) and the controlled substance is methamphetamine).

**A. Fifth and Sixth Amendments.** Biddle contends section 901.10(2) unfairly punishes defendants for remaining silent and demanding a jury trial. In support of his contention, he argues that a criminal defendant must necessarily incriminate himself to be eligible for the one-third reduction in sentence, which violates the Fifth Amendment right against self-incrimination. *See* U.S. Const. amend. V ("No person shall . . . be compelled in any criminal case to be a witness against himself. . . ."). He also argues that the statute requires defendants to waive their Sixth Amendment right to a jury trial to be eligible for the reduction in sentencing. *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ."). The Fifth and Sixth Amendments of the United States Constitution apply to the states through the Fourteenth Amendment Due Process Clause. *See Duncan v. State of Louisiana*, 391 U.S. 145, 149, 88 S.Ct. 1444, 1447, 20 L.Ed.2d 491, 496 (1968) ("[T]he Fourteenth Amendment guarantees a right of jury trial in all criminal cases which—were they to be tried in a federal court—would

come within the Sixth Amendment's guarantee."); *State v. Turner*, 630 N.W.2d 601, 606 (Iowa 2001) ("This right against self-incrimination is incorporated into the Due Process Clause of the Fourteenth Amendment and thus applies to the States.").

■ Biddle also contends the statute violates the equivalent rights guaranteed by article I, sections 9 ("[N]o person shall be deprived of life, liberty or property without due process of law.") and 10 ("In all criminal prosecutions, . . . the accused shall have a right to a speedy and public trial by an impartial jury . . . .") of the Iowa Constitution. "Although this court is the final arbiter of the Iowa Constitution, similar provisions of the state and federal constitutions 'are usually deemed to be identical in scope, import, and purpose.' " *State v. Boland*, 309 N.W.2d 438, 440 (Iowa 1981).

Biddle relies on two cases to support his arguments: *United States v. Jackson*, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968), and *State v. Nichols*, 247 N.W.2d 249 (Iowa 1976). Both cases can be distinguished.

In *Nichols*, this court said:

A defendant's right to demand a trial and to force the state to present its evidence to a fact finder is too fundamental to be so easily dismissed. The exercise of that right cannot be chilled by exacting a price therefor.

247 N.W.2d at 255. This court was addressing whether the district court based its sentence on an impermissible determining factor—the defendant's failure to plead guilty. *Id.* at 250–51. Here, however, the legislature has explicitly limited the exercise of the sentencing court's discretion in reducing a sentence. The question is whether the legislature acted unconstitutionally in doing so. The United States Supreme Court has squarely addressed this question in two cases we proceed to discuss.

In *Jackson*, the Supreme Court held unconstitutional the death sentence provided by the Federal Kidnapping Act. *Jackson*, 390 U.S. at 582–83, 88 S.Ct. at 1216–17, 20 L.Ed.2d at 147–48. The Act provided for the imposition of the death penalty only upon the recommendation of a jury. *Id.* at 571, 88 S.Ct. at 1210, 20 L.Ed.2d at 141. The statute set forth no procedure for imposing the death penalty upon a defendant who waived the right to jury trial or pleaded guilty; the maximum penalty for such defendants was life imprisonment. *Id.* Thus, only those insisting on a jury trial faced the possibility of a death sentence. The Court held the provisions were a needless encouragement to plead guilty or to waive a jury trial and declared the death penalty provisions unconstitutional. *Id.* at 582–83, 88 S.Ct. at 1216–17, 20 L.Ed.2d at 147–48.

The Supreme Court distinguished *Jackson* in *Corbitt v. New Jersey*, 439 U.S. 212, 99 S.Ct. 492, 58 L.Ed.2d 466 (1978). In *Corbitt*, a New Jersey homicide statute provided a mandatory punishment of life imprisonment for those convicted by a jury of first-degree murder and punishment by a term of not more than thirty years for second-degree murder. 439 U.S. at 215, 99 S.Ct. at 495, 58 L.Ed.2d at 472. If a defendant entered a plea of *non vult* or *nolo contendere*, however, punishment was either life imprisonment or a thirty-year indeterminate term. *Id.*

Corbitt, after pleading not guilty to a murder indictment, was convicted of first-degree murder. *Id.* at 216, 99 S.Ct. at 496, 58 L.Ed.2d at 472. On appeal, relying on *Jackson*, he argued the New Jersey statutory scheme violated his Fifth and Sixth Amendment rights. *Id.* The Supreme Court concluded that *Jackson* "does not require a reversal of Corbitt's conviction"

because (1) the death penalty, "unique in its severity and irrevocability," was not involved, and (2) "although the punishment when a jury finds a defendant guilty of first-degree murder is life imprisonment, the risk of that punishment is not completely avoided by pleading *non vult* because the judge accepting the plea has the authority to impose a life term. New Jersey does not reserve the maximum punishment for murder for those who insist on a jury trial." *Id.* at 217, 99 S.Ct. at 496–97, 58 L.Ed.2d at 473 (citations and footnotes omitted). The Court noted that

> not every burden on the exercise of a constitutional right, and not every pressure or encouragement to waive such a right, is invalid. Specifically, there is no *per se* rule against encouraging guilty pleas.

*Id.* at 218–19, 99 S.Ct. at 497, 58 L.Ed.2d at 474 (footnote omitted). The Court upheld New Jersey's sentencing scheme, noting that "a State may make due allowance for pleas in its sentencing decisions and that New Jersey has not exceeded its powers in this respect by its statutory provision extending the possibility of leniency to those who plead *non vult* in homicide cases." *Id.* at 225 n. 15, 99 S.Ct. at 500 n. 15, 58 L.Ed.2d at 478 n. 15.

The statute here more closely resembles the statute in *Corbitt.* The death penalty is not involved. Additionally, section 901.10(2) gives the sentencing court discretion to reduce the mandatory minimum sentence of those pleading guilty. A defendant therefore could receive the mandatory minimum sentence whether or not he or she pleads guilty. The statute, we conclude, does not violate Biddle's Fifth or Sixth Amendment rights under the Federal Constitution or his rights under the Iowa Constitution. The district court was correct in reaching the same conclusion.

**B. Equal protection.** Biddle contends that sections 901.10(2) and 907.3(3)(e) violate equal protection by treating methamphetamine users more harshly than users of other addictive and life-threatening hard drugs.

■ The Equal Protection Clause of the United States Constitution prohibits states from denying "to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Iowa Constitution prohibits laws that "grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms shall not equally belong to all citizens." Iowa Const. art. I, § 6. We usually deem the federal and state Equal Protection Clauses to be identical in scope, import, and purpose. *Bowers v. Polk County Bd. of Supervisors,* 638 N.W.2d 682, 689 (Iowa 2002). Therefore, we apply the same analysis in considering federal and state equal protection claims. *Id.*

■ The Equal Protection Clause requires that similarly situated persons be treated alike. *Id.* Any governmental classification of persons "must meet the applicable constitutional standard imposed under the Equal Protection Clause." *Id.* (citation omitted).

■ The first step in an equal-protection analysis is to determine the appropriate standard of review. *In re B.B.,* 516 N.W.2d 874, 880 (Iowa 1994). Unless a suspect class or fundamental right is involved, any classification made by the legislature need only have a rational basis. *Bowers,* 638 N.W.2d at 689.

■ In the district court, Biddle contended there was no rational basis to treat methamphetamine offenses different from other "hard" drug offenses such as crack cocaine or heroin. On appeal, Biddle argues for the first time that strict scrutiny should apply because "[t]he rights

which are at stake in the instant matter are fundamental in nature and are explicitly articulated in the Bill of Rights." Biddle failed to preserve error on the application of strict scrutiny by failing "to alert the district court to [his] contentions at trial." *State v. Kinkead*, 570 N.W.2d 97, 102 (Iowa 1997). The rule of error preservation applies with equal strength to constitutional issues. *Id.*

Under the rational-basis standard, a statute "enjoys a presumption of constitutionality which can only be overcome by proof that the law is patently arbitrary and bears no rational relationship to a legitimate governmental interest." *Id.* (citation omitted). A classification is reasonable

> [i]f it is "based upon some apparent difference in situation or circumstances of the subjects placed within one class or the other which establishes the necessity or propriety of distinction between them." A classification "does not deny equal protection simply because in practice it results in some inequality; practical problems of government permit rough accommodations . . . ."

*Id.* (quoting *State v. Mann*, 602 N.W.2d 785, 792 (Iowa 1999) (citation omitted)).

██ The legislature enjoys broad discretion in defining and classifying criminal offenses. *State v. Ceaser*, 585 N.W.2d 192, 196 (Iowa 1998). The classification, however, "must be based on some apparent difference in situation or circumstance of the subjects placed within one class or the other which establishes the necessity or propriety of distinction between them." *Id.* (citation omitted).

██ The State contends the statutes at issue "address the widely documented dramatic increase in the manufacture and use of methamphetamine in recent years." Given this increase, "the legislature could reasonably conclude that the comparative impact on the community and highly addictive nature of methamphetamine outweighs that of other 'hard drugs.' "

We agree with this analysis. Biddle fails to overcome the high burden he has to show these statutes violate equal protection. The statutes are rationally related to the government's interest in curbing the increasing and widespread use of methamphetamine, a highly addictive drug. As we noted in *Ceaser*, it is up to the legislature to determine the most appropriate method of punishing and deterring criminal activity. 585 N.W.2d at 199. The district court did not err in denying Biddle's equal protection challenge to the sentencing statutes in question.

## VIII. Ineffective Assistance of Counsel.

Biddle argues that to the extent his trial counsel failed to preserve error on any issues raised, his counsel was ineffective. As mentioned, Biddle failed to preserve error on the application of strict scrutiny to his equal protection claim.

██ To prove an ineffective assistance of counsel claim, "a defendant must prove by a preponderance of the evidence that (1) counsel failed to perform an essential duty, and (2) prejudice resulted therefrom." *Kinkead*, 570 N.W.2d at 103 (citation omitted). Generally, we do not resolve claims of ineffective assistance of counsel on direct appeal. *Id.* Rather, we preserve such claims for postconviction relief proceedings, where an adequate record of the claim can be developed and the attorney charged with providing ineffective assistance may have an opportunity to respond to defendant's claims. *Id.*

We preserve for postconviction relief proceedings Biddle's claim that counsel was ineffective for failing to raise in district court the application of strict scrutiny to Biddle's equal protection claim.

### IX. Disposition.

In sum, we conclude the district court did not abuse its discretion in allowing into evidence the methamphetamine and lab report regarding it over Biddle's chain-of-custody objection. The court correctly refused to grant Biddle's motion for judgment of acquittal and did not improperly aid the State on the chain-of-custody issue. Finally, the district court correctly rejected Biddle's constitutional challenges to the sentencing statutes in question. For all of these reasons, we affirm. However, we preserve for postconviction relief proceedings Biddle's claim that counsel was ineffective for failing to raise in district court the application of strict scrutiny to Biddle's equal protection claim.

**AFFIRMED.**