# IN THE COURT OF APPEALS OF IOWA

No. 13-2004
Filed June 10, 2015

**STATE OF IOWA,**
     Plaintiff-Appellee,

**vs.**

**SPENCER A. PIERCE,**
     Defendant-Appellant.
_____

     Appeal from the Iowa District Court for Polk County, Arthur E. Gamble, Judge.

     A criminal defendant appeals from his convictions for first-degree murder and first-degree robbery. **REVERSED AND REMANDED.**

     Mark C. Smith, State Appellate Defender, and Maria Ruhtenberg, Assistant Appellate Defender, for appellant.

     Thomas J. Miller, Attorney General, Kevin Cmelik and Kyle P. Hanson, Assistant Attorney General, John P. Sarcone, County Attorney, Daniel Voogt and Stephanie Cox, Assistant County Attorneys, for appellees.

     Heard by Vogel, P.J., and Potterfield and Mullins, JJ.

**MULLINS, J.**

Spencer Pierce appeals his convictions for murder in the first degree and robbery in the first degree. His co-defendant, Deanna Hood, appeals separately. *See State v. Hood*, No. 13-1998, ____ WL _____ (Iowa Ct. App. June 10, 2015). Pierce contends (1) there was insufficient evidence in the record to find him guilty, (2) the district court erred in allowing the State to present evidence of Pierce's drug dealing, and (3) the district court erred in allowing the State to show the jury a reenactment of a surveillance video.

We find the evidence is insufficient to convince a rational trier of fact of Pierce's guilt. Therefore, substantial evidence does not support his convictions, and we reverse and remand for dismissal of the charges. We do not address the other appeal arguments.

## I.    BACKGROUNDS FACTS AND PROCEEDINGS.

The facts of the two cases are set out in greater detail in *State v. Hood*, No. 13-1998, ____ WL _____ (Iowa Ct. App. June 10, 2015). For the purposes of this appeal, we focus particularly on the facts pertinent to Pierce. We set out additional facts here as necessary.

Substantial evidence supports a finding that Pierce accompanied Hood to Harmon's apartment to try to accomplish a drug deal between Hood and the purchaser, with Harmon acting as a go-between. The purchaser testified Harmon appeared to discuss the deal with Hood but not with Pierce. Pierce and Hood then left Harmon's apartment in a Dodge Durango that a witness testified was gold in color.

Harmon and his paramour, Kimberly Frye, went to his trailer at 1631 East Aurora Avenue to collect the drugs. A car pulled up and Harmon went outside while Frye remained inside. Frye heard a voice she described as male and African-American shortly before she heard gunshots and a vehicle driving away. Pierce is an African-American man. Frye saw Harmon shot and lying on the ground by the trailer and she sought help from a neighbor, Robert Rokitnicki. He drove her to a nearby gas station to wait for police officers.

Bree Whipps saw Hood and Pierce together at a convenience store that night sometime between 10:00 p.m. and 2 a.m. Pierce helped Whipps look for a hotel, driving her in a red Saturn sedan and eventually taking her to his uncle's house. The next day, Hood and Pierce saw Whipps and were again driving the red Saturn sedan. The convenience store where Whipps saw Pierce and Hood was a very short walking distance from their apartment on Arnold Road.

On June 7, an officer observed Pierce driving a silver Dodge Durango into his apartment parking lot. Officers seized the vehicle and during a later search found methamphetamine under the hood of the car. Officers also found evidence of drug distribution in the apartment Pierce shared with Hood. The last phone call from Pierce's cellular telephone on the evening of June 5 was at 11:20 p.m. The next time the telephone was used, Pierce received calls from Whipps at 1:13 a.m. and again at 1:45 a.m. He next made an outgoing call at 3:29 a.m. Police officers determined that all the calls Pierce made and received during the night in question bounced off cellular towers closest to his Arnold Road apartment building, located several miles from the site of the murder.

The State charged Pierce both as a principal and as the aider-and-abettor of first-degree murder, a class "A" felony, in violation of Iowa Code section 707.2, and first-degree robbery, a class "B" felony, in violation of section 711.1 and .2. The State also alleged that Pierce was in possession of a dangerous weapon, displayed a dangerous weapon in a threatening manner, or was armed with a dangerous weapon, pursuant to Iowa Code section 902.7. Following trial, the jury found both Hood and Pierce guilty as charged. On appeal, Pierce contends there was insufficient evidence to support the conviction. Pierce also contends the district court erred in allowing into the record the drug evidence from the apartment and the Dodge Durango and a reenactment of the surveillance video from the trailer lot where Harmon was killed.

## II.     ANALYSIS.

"Challenges to the sufficiency of the evidence are reviewed for correction of errors at law." *State v. Hansen*, 750 N.W.2d 111, 112 (Iowa 2008). "We allow a verdict to stand if substantial evidence supports it." *State v. Biddle*, 652 N.W.2d 191, 197 (Iowa 2002). "Evidence is substantial if it would convince a rational fact finder that the defendant is guilty beyond a reasonable doubt." *Id.* "We review the evidence in the light most favorable to the State, including legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence." *Id.* "We consider all the record evidence, not just the evidence that supports the verdict." *Id.* "'[E]vidence which merely raises suspicion, speculation, or conjecture is insufficient.'" *State v. Hearn*, 797

N.W.2d 577, 580 (Iowa 2011) (quoting *State v. Casady*, 491 N.W.2d 782, 787 (Iowa 1992)).

"The Iowa Code provides that those who aid and abet in the commission of a public offense 'shall be charged, tried and punished as principals.'" *Hearn*, 797 N.W.2d at 580 (quoting Iowa Code § 703.1). "To sustain a conviction under a theory of aiding and abetting, the record must contain substantial evidence the accused assented to or lent countenance and approval to the criminal act by either actively participating or encouraging it prior to or at the time of its commission." *Id.* (internal quotations omitted). "Knowledge is essential; however, neither knowledge nor presence at the scene of the crime is sufficient to prove aiding and abetting." *Id.* (internal quotations omitted). "A defendant's participation may, however, be proven by circumstantial evidence." *Id.*

The court gave the jury the following instructions on first-degree murder and first-degree robbery:

> In Count I as to each defendant, the State must prove all of the following elements of Murder in the First Degree:
> 1.  On or about June 6, 2013, the defendant or someone he or she aided and abetted, shot Steven Harmon.
> 2.  Steven Harmon died as a result of being shot.
> 3.  The defendant, or someone he or she aided and abetted, acted with malice aforethought.
>     a.  The defendant, or someone he or she aided and abetted, acted willfully, deliberately, premeditatedly and with a specific intent to kill Steven Harmon; and/or
>     b.  The defendant, or someone he or she aided and abetted, was participating in the forcible felony of Robbery.
> If the State has proved all of the elements, the defendant is guilty of Murder in the First Degree in Count I.

In Count II as to each defendant, the State must prove all of the following elements of Robbery in the First Degree:
1. On or about June 6, 2013, the defendant or someone he or she aided and abetted had the specific intent to commit a theft.
2. To carry out his or her intention or to assist him or her in escaping from the scene, with or without the stolen property, the defendant or someone he or she aided and abetted:
a. Committed an assault on Steven Harmon, and/or
b. Threatened Steven Harmon with, or purposely put Steven Harmon in fear of immediate serious injury.
3. The defendant or someone he or she aided and abetted was armed with a dangerous weapon.
If the State has proved all of the elements, the defendant is guilty of Robbery in The First Degree.

In special interrogatories, the jury found that in the commission of the first-degree murder and first-degree robbery, the defendants "represented they were in the immediate possession and control of a dangerous weapon, displayed a dangerous weapon in a threatening manner, or [were] armed with a dangerous weapon." Pierce contends there was insufficient evidence to prove him guilty of murder and robbery, either as the principal or as an aider and abettor. The primary issue in this case is whether there is sufficient evidence to place Pierce at the murder scene at about 1:00 a.m. on June 6.

Although Harmon arranged a drug transaction, he appeared to do so solely with Hood. He spoke with Hood in the apartment about the purchaser's payment. There is no evidence he spoke with Pierce about the purchase. The purchaser's apparent understanding was that Hood was the dealer. There is no direct evidence that Pierce was involved in arranging the drug deal at the trailer, nor that he participated in it. There is, however, evidence that he was present at

Harmon's apartment with Hood before the shooting and may have been seen after the time of the shooting, with Hood, at the convenience store. The State asserts that circumstantial evidence supports a reasonable inference that if Pierce was with Hood before and after the murder, he must have been with her during the murder. As part of its circumstantial case, the State asserts Pierce was seen at the convenience store after the murder.

First, it is clear Pierce was with Hood at Harmon's apartment earlier in the evening. At 1:17 a.m., Rokitnicki, a neighbor, called 911 to report the shooting. Given that Frye remained in the trailer for about twenty minutes after the shooting, the murder likely occurred sometime between 12:50 and 1:00 a.m. Whipps estimated she saw Hood and Pierce at the convenience store sometime between 10:00 p.m., and 2:00 a.m., which would have been either well before the shooting or shortly after the shooting. Based on the 1:17 a.m. time of the 911 call from Rokitnicki, the State's theory requires that Hood was at the store between about 1.00 a.m. and 2:00 a.m. Yet the phone records show Whipps made two phone calls to Pierce in this narrow window, at 1:13 a.m. and at 1:45 a.m., when she was allegedly with Pierce in person at the convenience store. It does not make sense that she would call him on a phone if he were present at the store. There is not enough evidence in the record to support the conclusion that Whipps saw Pierce and Hood at the convenience store immediately after the time of the murder. Thus, one key piece of the circumstantial evidence supporting the State's theory is missing.

Second, while Hood's telephone records place her close to the site of the murder at the correct time, Pierce's telephone records show that at all the times it was used that evening, his phone signal only bounced off the tower in the neighborhood of his apartment, several miles away from the murder scene. The record does not support the premises that underlie the State's theory—namely, that Pierce was with Hood before and after the shooting and must have been with her during the shooting. On this weak a record, that inference would be unreasonable.

In addition, the identifying information of the two killers at the murder site is weak. The only identifying information was that one sounded to Frye like an African-American man. The State's theory is that since Pierce is an African-American man who was seen driving a Dodge Durango earlier that evening and was also seen a day later driving a Dodge Durango, identified as the same car from the surveillance video, then Pierce was one of the participants at the murder scene. However, a different African-American man, Corvelle Beeks, was the live-in boyfriend of the owner of the silver Dodge Durango. He, like Hood, deactivated his cellular telephone the day after the murder. The record also is not clear as to Hood's whereabouts during the time Pierce was with Whipps. When Pierce drove Whipps around on the night of the murder, they were in a small, red Saturn sedan, not a Dodge Durango. There is no evidence of the location or occupants of the Dodge Durango during the time Pierce and Whipps were riding in the red Saturn.

We compare the lack of evidence in the case against Pierce with the evidence that is against Hood. Hood talked with Harmon at his apartment, apparently concerning a drug transaction. Hood's cellular records place her near the scene of the murder and establish she was in contact with Harmon up until the time of the murder. No such evidence places Pierce at the scene or in contact with Harmon. The fact that Hood never used the phone again and deactivated it the next day supports an inference she got rid of evidence that connected her to Harmon and the crime. Pierce retained the same phone and continued using it after the time of the murder. On the whole, the quantum of evidence that tips the scale in favor of affirming the conviction with respect to Hood does not exist with respect to Pierce.

We also note a lack of physical evidence connecting Pierce to the murder or the instruments involved. The murder weapon and the cash were never recovered. Neither was Harmon's cellular telephone. There was no evidence of blood or gunshot residue connected to Pierce, in his apartment, or in the Durango. The weight of the evidence, even when taken in the light most favorable to the State and when making all fair and reasonable inferences, convinces us that a rational trier of fact could not have found, beyond a reasonable doubt, that Pierce killed or robbed Harmon, or aided and abetted another in doing so. Pierce's alleged involvement in these crimes is speculative and based primarily on his presence with Hood several hours before, and shaky evidence that he was with Hood afterward. While the evidence against Hood is not overwhelming, we have found it is sufficient to convince a rational trier of fact

of Hood's guilt. *See State v. Hood*, No. 13-1998, ____ WL _____ (Iowa Ct. App. June 10, 2015). Pierce appears to have been painted with the same broad brush. Substantial evidence does not, however, support his convictions, and we reverse them. We need not address the other arguments in this appeal.

**III.    CONCLUSION.**

Finding the evidence is insufficient to convince a rational trier of fact of Pierce's guilty beyond a reasonable doubt, we conclude substantial evidence does not support the convictions. We vacate the sentences, reverse the convictions, and remand for dismissal of the charges against him in this case.

**REVERSED.**

Potterfield, J., concurs specially.

**POTTERFIELD, J.** (concurring specially)

I concur with the majority in finding there is insufficient evidence to support Pierce's convictions. I write separately to note the district court abused its discretion by admitting evidence concerning the discovery of drugs and related equipment in the defendants' apartment and the Durango driven by Pierce at the time of his arrest. As more fully delineated in my dissent in *State v. Hood*, No. 13-1998, 2015 WL _____, at *__ (Iowa Ct. App. June 10, 2015), the State's evidence showing the discovery of methamphetamine, marijuana, and drug paraphernalia in the Durango and the apartment had no relevance in these proceedings besides its tendency to imply a propensity for unlawful activity as a possessor or a dealer of illegal drugs. As I wrote in my dissent in *Hood*:

> Evidence showing the presence of drugs in the vehicle was not inextricably intertwined with the robbery and murder. Neither that evidence nor evidence of drugs found in the apartment was admissible to show the defendants' motive, intent, identity, or malice aforethought. The evidence of either drug cache is highly prejudicial and minimally probative. It was therefore impermissible character evidence, and the district court abused its discretion by admitting it.

2015 WL _____, at *__.

Admission of the drug evidence is even more patently improper here than in *Hood* because other evidence does not support Pierce's involvement in dealing drugs. As the majority notes, the evidence shows the purported drug deal occurred between Harmon and Hood alone. The contested evidence therefore fails at the non-propensity purposes put forward by the State. Even if there were substantial evidence in the record to support Pierce's convictions, the

district court's abuse of its discretion in admitting the drug evidence would require reversal and a new trial on remand.