# IN THE COURT OF APPEALS OF IOWA

No. 19-0364
Filed November 30, 2020

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**DARLIN LENIN VELIZ ACOSTA,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Polk County, Robert B. Hanson, Judge.

        Darlin Veliz Acosta appeals his convictions of sexual abuse in the second degree and lascivious acts with a child.  **AFFIRMED.**

        Elena M. Greenberg of Greenberg Law, Des Moines, for appellant.

        Thomas J. Miller, Attorney General, and Kevin Cmelik, Assistant Attorney General, for appellee.

        Considered by Vaitheswaran, P.J., Schumacher, J., and Mahan, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2020).

**MAHAN, Senior Judge.**

Darlin Veliz Acosta appeals his convictions of sexual abuse in the second degree and lascivious acts with a child, raising claims with regard to the admission of electronic messages and defense counsel's failure to object to statements by the prosecutor during closing argument. Upon our review, we affirm.

## I.  *Background Facts and Proceedings*

D.R. went to her friend's house for a sleepover. During the middle of the night, the friend's father, Acosta, entered the girls' bed and "touch[ed]" D.R., first "with his hand, and then he started with his part." "[H]e touched the inside, and then he started touching the inside." His penis went in D.R.'s vagina "a little bit," but then she moved to get away. D.R. did not say anything to her friend because she "was afraid."

The next evening, Acosta offered to drive D.R. home. When they reached the parking lot of D.R.'s house, Acosta "asked [her] to stay a little bit longer" and then "[h]e started touching [her] parts" "under" her clothes. Acosta stopped when her friend called to "see where [they] were." That evening, Acosta added D.R. as a "friend" in Snapchat[1] and began sending her messages.

The State filed a trial information charging Acosta with several offenses. The matter proceeded to trial, and the jury found him guilty of sexual abuse in the second degree and lascivious acts with a child. Acosta appeals.

---

[1] Snapchat is "the proprietary name of an image messaging service and application, through which users can share images that may be private and temporary or public and stored for retrieval." *Snapchat*, Dictionary.com, https://www.dictionary.com/browse/snapchat?s=t (last visited Nov. 5, 2020); *accord State v. Wilson*, No. 19-2051, 2020 WL 5944454, at *5 n.4 (Iowa Ct. App. Oct. 7, 2020).

## II.     Foundation for Admission of Snapchat Messages

Acosta appeals the district court's decision to allow evidence of Snapchat messages sent between himself and D.R.[2]  We review district court rulings on evidentiary issues for an abuse of discretion.  *Powers v. State*, 911 N.W.2d 774, 780 (Iowa 2018).

Acosta filed a motion in limine raising a foundational objection to the messages, arguing "there's no authentication of the sender."  The district court stated it would wait to rule on the objection after determining during trial whether the State could establish the requisite foundation for admission of the messages.

On direct examination, the prosecutor elicited the following testimony from D.R. with regard to the messages:

> Q. [Did the defendant take your phone] [t]he day after the sleepover, but before you went home?  A. Yes.
> . . . .
> Q. Do you know what he did with your phone?  A. He added me.
> Q. Added you on what?  A. Snapchat.
> Q. Okay.  So after that he was a contact in your Snapchat app?  A. Yes.
> Q. Did you receive messages after that from that contact? A. Yes.
> . . . .
> Q. Okay.  Based on the context of the things that this person said to you, could you tell who it was that was sending them?  A. Yes.
> Q. Okay.  And who was sending them?  A. [My friend]'s father.

The prosecutor then showed Exhibit 16[3] to D.R. and asked:

> Q. Do you recognize that?  A. Yes.
> Q. What is Exhibit 16?   A. A photo, a screenshot of the contact.

---

[2] The messages were typed in Spanish, but prior to trial the parties stipulated to a version of the messages translated to English by a certified interpreter in the event the evidence was admitted.
[3] Exhibit 16 was admitted without objection.

Q. All right. In Snapchat? A. Yes.

Q. Okay. Is this the contact that the defendant used to send you messages? A. Yes.

. . . .

Q. On the top it says "Tio"? A. Yes.

. . . .

Q. And on the bottom it says, "VJ Lenin Wolf 128"? A. Yes.

. . . .

Q. Okay. So do either of those names show up on the messages when they come to you? A. Yes.

Q. Which one? A. Tio.

Q. So these messages from Tio, did they start after the defendant added himself in your phone? A. Yes.

Q. And did they end when you ultimately reported the assault to the police? A. Yes.

Q. And did you receive messages regularly between those two times? A. Yes.

Q. Now, were you telling us yesterday about a time that you went over to [N.]'s house? A. Yes.

Q. And did you tell [N.] what had happened to you? A. Yes.

Q. And did the two of you send some messages to the defendant in Snapchat? A. Yes.

Q. Did the defendant respond? A. Yes.

Q. Did you and [N.] photograph those messages? A. Yes.

The prosecutor then showed Exhibits 1 through 11 (photographs of the Snapchat messages sent between Acosta and D.R.) to D.R. and asked:

Q. Do you recognize those 11 pictures? A. Yes.

Q. Are those pictures that were taken when you were sending messages back and forth with the defendant from [N.]'s bedroom? A. Yes.

At that point, over defense counsel's objection, the district court ruled to admit Exhibits 1 through 11. And pursuant to the parties' prior stipulation, the prosecutor provided the jury with Exhibits 1-A through 11-A, Spanish-to-English translations of Exhibits 1 through 11.[4] D.R. then testified:

---

[4] These exhibits included statements from Acosta such as: "We just did that bc I liked you"; "I didn't make you"; "I won't continue"; "Who else knows"; "If you don't want anything that's fine I won't do anything else"; and "You can always come play with [my daughter] so your mom doesn't get suspicious."

Q. Now, can you tell us what was the purpose of sending those messages that day? A. For me to not continue being bothered by him.

Q. So you said that he had sent you messages regularly, but after the assaults happened up through this? A. Yes.

Q. And can you tell us about those messages? A. How so?

Q. Just tell us the kinds of things the defendant said to you through those messages that came before these ones. A. Like, that if he touched me, my body would grow faster and things like that.

Q. Okay. How often did he send you these messages? A. Very often.

Acosta contends the evidence was inadmissible under Iowa Rule of Evidence 5.901. That rule provides: "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Iowa R. Evid. 5.901(a). Evidence can be authenticated by "[t]estimony that an item is what it is claimed to be." Iowa R. Evid. 5.901(b)(1). "Evidence that an electronic writing is what the proponent claims it is requires 'evidence sufficient to show that the purported author of the communication, whether it be an email, a Facebook posting, or a text message, actually authored or published the content.'" 7 Laurie Kratky Dore, *Iowa Practice: Evidence* § 5.901:11; *accord State v. Simpson*, No. 18-0666, 2020 WL 4812647, at *2 (Iowa Ct. App. Aug. 19, 2020). "Authenticating circumstances can include the context of the [electronic message]." *Id.*

Here, D.R. identified Exhibit 16 as the username of the person who sent the messages, took screenshots of the messages, stated the timing the messages took place, and explained the context of the messages. We conclude the district court did not abuse its discretion in finding D.R.'s testimony sufficient to establish that the messages were what she claimed them to be. *See, e.g.*, *Simpson*, 2020 WL 4812647, at *2 (concluding the testimony of the owner of a Facebook account

was sufficient to establish foundation for screenshots of posts of a comment stream on the account); *State v. Goodwin*, No. 18-1822, 2020 WL 1551149, at *5 (Iowa Ct. App. Apr. 1, 2020) (concluding "[t]here was enough circumstantial evidence linking Goodwin to the texts sent by Edwin to let the jury decide whether it believed he was the sender"); *State v. Akok*, No. 17-0655, 2018 WL 4362065, at *1 (Iowa Ct. App. Sept. 12, 2018) (finding "a sufficient prima facie case of authenticity made" based in part on the fact that Facebook messages "were sent from the account of a person identifying himself to be Akuk Akok"). The jury was still free to weigh the evidence as it chose. *See State v. Biddle*, 652 N.W.2d 191, 196–97 (Iowa 2002) ("When the district court has determined that the State has established a sufficient foundation for the admission of the physical evidence, any speculation to the contrary affects the weight and not the admissibility of the evidence."). We affirm on this issue.

## III.  *Ineffective Assistance of Counsel*

Acosta contends his trial counsel was ineffective for "failing to object to prosecutorial misconduct in the State's closing argument."[5] We review this claim de novo. *See State v. Shorter*, 945 N.W.2d 1, 6 (Iowa 2020). To prevail, Acosta must show "(1) counsel failed to perform an essential duty; and (2) prejudice

---

[5] The State argues we do not have jurisdiction to hear this claim pursuant to Iowa Code section 814.7, which was recently amended to require defendants to raise claims of ineffective assistance of counsel exclusively through postconviction-relief proceedings and prohibit defendants from raising such claims on direct appeal. 2019 Iowa Acts ch. 140, § 31. The amendment took effect July 1, 2019, and does not apply retroactively to appeals pending on July 1, 2019. *See State v. Ross*, 941 N.W.2d 341, 345 (Iowa 2020) (holding we have jurisdiction to hear ineffective-assistance-of-counsel claims on direct appeal only "if the appeal was already pending on July 1, 2019"). Here, because notice of appeal was filed on March 5, 2019, we can proceed to address Acosta's ineffective-assistance-of-counsel claim.

resulted." *State v. Maxwell*, 743 N.W.2d 185, 195 (Iowa 2008) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). An ineffective-assistance-of-counsel claim fails if either element is lacking. *See State v. Clay*, 824 N.W.2d 488, 495 (Iowa 2012). We find the record adequate to address his claim. *See State v. Fountain*, 786 N.W.2d 260, 263 (Iowa 2010).

Acosta points to the following statements made by the prosecutor during closing argument, arguing the statements equate to "pervasive commentary on the veracity of the witnesses" that "depriv[ed] [him] of a fair trial":

- "'Facts are stubborn things, they never change, and you can't ignore them,' John Henry."

- "Now, the defendant's explanations, his attempts at getting around these clear facts, have involved some wild explanations. Each one of them individually is unbelievable. But the combination of them, this perfect storm that he's trying to get you to believe, is where it becomes truly absurd because, ladies and gentlemen, the facts are stubborn things, and the defendant can't ignore them."

- "So the question is: Should she be believed? Based on what we've seen in this trial, should she be believed? And that comes down to credibility. Okay? So let's take a look at her credibility and see whether we can sort out whether she is a credible witness or not."

- "Now, in this case [D.R.] is not the used car salesman. All right? That's the defendant. The defendant is the one who has something to gain or to lose based on your decision. He's the one who has a motivation to try and get you to do something in particular."

- Now, that's not to say she doesn't want you to believe her, right, but she doesn't have an ulterior motive; right? When she reports what happened to her, she has no reason for somebody to believe her other than just that she is telling the truth. Okay?

- "[T]here simply can't be any question. These messages were sent by the defendant. Okay? His claims that they weren't don't hold up. All right? The account was under his name."

- "Now, I understand the defendant is arguing some of that stuff is wrong, that he just didn't understand it. But plainly when you watch the video [of the police interview], he understood what the detective was asking, and the detective understood him."

- "But, clearly, the defendant from the beginning [of the police interview] was trying to talk his way out of this thing; right? He was trying to identify what he could say that would keep him out of trouble. All right? Now, the defendant was, apparently, acting under a misunderstanding of exactly where the line was that he wasn't allowed to cross. Apparently, he thought he could touch her in the groin area, even up in the pubic hair area, as long as he didn't touch the vagina. That's what the defendant, apparently, thought during this interview, and that's what he was trying to convince the detective that he had done."

- "He was worried there was going to be surveillance video, and so he changed his story. He was worried there was going to be DNA evidence, and so he changed his story. That is not consistent with somebody who came in and tried to be honest from the beginning. He pretended there was no Snapchat conversation and then admitted there was. Okay? These things changed because he was confronted with the evidence the detective had or might get. That is behavior of somebody just trying to weasel their way out of a situation."

- "Well, they're [Acosta's two alibi witnesses] backing up their buddy. Okay?"

- "So it works better if, you know, let's try to figure out how to get that dress out of the picture, so we come up with a language barrier argument, which it doesn't hold up when watching that. Again, just the usage of the term 'dress.' . . . And then we actually saw the dress. The dress made its way into this courtroom via [D.R.]'s mother. They had the dress the whole time because they're telling the truth. She wore the dress home, and they've had it ever since. Okay? That is plainly inconsistent with the defendant's testimony. The defendant was not being truthful with you when he told you that part of the story."

- "There is an explanation for all of this evidence that doesn't require us to believe that these girls fabricated these Snapchat messages or that the defendant had these unbelievable lapses in the use of the English language or that his brother was involved in something or any of these other claims that he's making, and that's that the defendant is just guilty. Okay? He did the crime. [D.R.] was telling the truth; right? The things that she said actually happened, as are corroborated by the evidence that we've seen. Okay? . . . He said some other weird things during his testimony that, obviously, weren't true; right?"

- "It is preposterous to suggest that she fabricated this whole thing."

According to Acosta, the prosecutor's statements are "just another way of calling [him] a liar." Indeed, "it is improper for a prosecutor to call the defendant a liar, to state the defendant is lying, or to make similar disparaging comments." *State v. Graves*, 668 N.W.2d 860, 876 (Iowa 2003). But that is not what the prosecutor did here. Acosta "chooses selective language supportive of his argument" and "fails to acknowledge the prosecutor's detailed walk through the evidence" with regard to the statements as a whole. *See State v. Jefferson*, No. 16-0935, 2018 WL 4354469, at *8 (Iowa Ct. App. Sept. 12, 2018) ("The challenged statements were nothing more than arguments based on reasonable inferences of the evidence, and they did not amount to misconduct." (citing *Graves*, 668 N.W.2d at 876)). The prosecutor is "free 'to craft an argument that includes reasonable inferences based on the evidence and . . . when a case turns on which of two conflicting stories is true, [to argue that] certain testimony is not believable.'" *Graves*, 668 N.W.2d at 876 (alterations in original) (citation omitted).

> Thus, misconduct does not reside in the fact that the prosecution attempts to tarnish defendant's credibility or boost that of the State's witnesses; such tactics are not only proper, but part of the prosecutor's duty. Instead, misconduct occurs when the prosecutor

seeks this end through unnecessary and overinflammatory means that go outside the record or threaten to improperly incite the passions of the jury.

*State v. Carey*, 709 N.W.2d 547, 556 (Iowa 2006). Here, we do not believe the prosecutor's statements raised the "possibility that [the] jury might convict [Acosta] for reasons other than those found in the evidence." *Id.* Because we find there was no prosecutorial error, an ineffective-assistance-of-counsel claim based upon this claim must fail. *See Graves*, 668 N.W.2d at 870; *see also Fountain*, 786 N.W.2d at 263 ("Counsel has no duty to raise an issue that has no merit.").

We affirm Acosta's convictions of sexual abuse in the second degree and lascivious acts with a child.

**AFFIRMED.**