**IN THE COURT OF APPEALS OF IOWA**

No. 15-0559
Filed June 15, 2016

**IN THE INTEREST OF T.B.**
**Minor Child,**

**E.B., Mother,**
　　Appellant,

**C.B., Father,**
　　Appellant.
_____

Appeal from the Iowa District Court for Polk County, William A. Price, District Associate Judge.

A mother and her husband appeal from the order terminating their parental rights. **FATHER'S APPEAL VACATED; MOTHER'S APPEAL AFFIRMED ON CONDITION AND REMANDED.**

E.B., Carroll, appellant pro se mother.

C.B., Carroll, appellant pro se father.

Thomas J. Miller, Attorney General, and Kathrine S. Miller-Todd, Assistant Attorney General, for appellee State.

Paul White of Des Moines Juvenile Public Defender, Des Moines, attorney and guardian ad litem for minor child.

Considered by Danilson, C.J., and Vaitheswaran and Tabor, JJ.

**PER CURIAM.**

A mother and her husband appeal from the order terminating their parental rights to T.B., born in July 2014.

**I. Father's Appeal.**

C.B. is the child's established father under the Iowa Code. *See In re J.C.*, 857 N.W.2d 495, 501 (Iowa 2014) (citing Iowa Code § 144.13(2) (2013) ("If the mother was married at the time of . . . birth, . . . the name of the husband shall be entered on the [birth] certificate as the father of the child unless paternity has been determined otherwise by a court of competent jurisdiction, in which case the name of the father as determined by the court shall be entered by the department."); *Gartner v. Iowa Dep't of Pub. Health*, 830 N.W.2d 335, 344 (Iowa 2013) (holding that in Iowa the putative parent is the equivalent of a biological parent, unless a person rebuts the presumption by "'clear, strong, and satisfactory evidence'"); *Callender v. Skiles*, 591 N.W.2d 182, 185 (Iowa 1999) (recognizing "[t]he law deems" a married man to be the father of his wife's child "by virtue of his marriage")). However, he has never claimed to be the child's biological father.

A motion to establish paternity was filed. On January 15, 2015, in conjunction with the permanency hearing, the paternity issue was presented. On that same date, the court entered a permanency order establishing R.S. as the child's biological father and dismissing C.B. as a necessary party for the juvenile proceedings.

The supreme court has concluded that an established father such as C.B. is not a "parent" as that term is defined in chapter 232. Iowa Code § 232.2(39)

("'Parent' means a biological . . . father of a child . . . ."); *see J.C.*, 857 N.W.2d at 507 ("Nothing in the juvenile code warrants a blanket extension of rights to all established fathers to participate in CINA [child in need of assistance] or termination cases.").[1]

Because C.B. was not a parent for purposes of chapter 232, he did not have parental rights that could be terminated. *See* Iowa Code § 232.116(1) (providing for "termination of both the parental rights with respect to a child and the relationship between the parent and the child"). C.B. is not a parent under chapter 232, and we conclude the juvenile court did not have the authority in this termination proceeding to enter an order terminating his parental rights. We therefore conclude the order terminating his parental rights should be vacated. *See In re J.C.*, No 14-1195, 2015 WL 409250, at * 1–2 (Iowa Ct. App. Jan. 28, 2015).

---

[1] Our supreme court has stated:

> The legislature's decision to limit the necessary parties to biological or adoptive mothers or fathers does not preclude established parents from participating in those proceedings. Under Iowa Code section 232.91(2), a "person," a term that is not defined in chapter 232, "may petition the court to be made a party to [CINA] proceedings." The court of appeals has held similarly permissive language in Iowa Code section 232.91 means the decision whether to make the petitioner a party "is within the court's discretion." *In re T.M.C.*, 429 N.W.2d 165, 167 (Iowa Ct. App. 1988). In this case, the CINA petition identified Daniel as J.C.'s established father, Daniel received notice of the CINA proceedings, and he actively participated in the proceedings. However, when paternity was clearly established in Robert, the juvenile court, upon the guardian ad litem's motion and after a hearing, properly dismissed him as a necessary party.

*J.C.*, 857 N.W.2d at 501–02.

As was the case in *J.C.*, paternity of T.B. was established in another and the juvenile court dismissed C.B. as a necessary party. Although dismissed as a necessary party, an established father may petition the court to intervene as an interested party. *Id.* at 507–08.

**II. Mother's Appeal.**

We turn to the mother's appeal. *See In re D.G.*, 704 N.W.2d 454, 459 (Iowa Ct. App. 2005) ("[I]n termination of parental rights proceedings each parent's parental rights are separate adjudications, both factually and legally."). The following issues are raised under the following headings: (1) temporary removal, (2) CINA petition, (3) "Legal Documents Forgery," (4) removal order, (5) drug testing, (6) the adjudication order, (7) "The set up to have the parents pay for their attorneys, regardless of found and ruled indigency, and to claim that if we 'don't show up for our hearings', that cost will be applied," (8) "All events occurring up until the Dispositional hearing concerning the massive efforts employed by DHS and this court, in order to first, deprive the father of his constitutional rights of Free Speech . . . ," (9) dispositional order, (10) "The MOT hearing," (11) "The discovery of the deprivation of [Indian Child Welfare Act] ICWA rights in this case," (12) the permanency order, and (13) the termination hearing.

**III. Scope and Standard of Review.**

We review termination decisions de novo. *In re A.M.*, 843 N.W.2d 100, 110 (Iowa 2014).

**IV. Discussion.**

***A. Some claims not properly considered here.*** Issues covered in the following headings—(1) temporary removal, (2) CINA petition, (3) "Legal

Documents Forgery,"[2] (4) removal order, (5) drug testing, (6) the adjudication order, (8) "All events occurring up until the Dispositional hearing . . . deprive the father of his constitutional rights of Free Speech . . . ," and (9) dispositional order—are either res judicata or raise issues that are not a proper subject of an appeal of a termination action. The mother could have contested the CINA adjudicatory, removal, and dispositional orders upon entry of the October 21, 2014 dispositional order, which is appealable.[3] *See In re A.M.H.*, 516 N.W.2d 867, 872 (Iowa 1994). She did not do so, and all rulings subsumed therein are no longer subject to our review or reversal. *See In re D.S.*, 563 N.W.2d 12, 15 (Iowa Ct. App. 1997) (stating principles of res judicata preclude court from re-litigating an issue that was previously decided).

As for the legal father's right to free speech (issue (8)), the mother does not have standing to assert a violation of another's constitutional rights. *See Green v. Shama*, 217 N.W.2d 547, 556 (Iowa 1974) ("[A] litigant may only assert [their] own constitutional rights and immunities.").

***B. Claims by the mother to be considered.*** From the statements made in (7), the mother expresses dissatisfaction with a purported statement about costs being applied if she did not "show up for our hearings." No relief is requested.

---

[2] In this claim, the mother asserts:

> We, the defendants bring that legal documents, that were never presented, served or legally given or signed by these defendants have been forged to show this. Namely, we the defendants claim that the CINA petition was NEVER given to us or served upon us, nor did we EVER sign document receipts stating so.

The record belies this claim.

[3] We note the mother was represented by counsel until January 2, 2015, when the court granted counsel's application to withdraw. The mother filed a notice of "appearance as pro se litigant" on January 14, 2015.

We believe issue (10) "MOT hearing," refers to a motion hearing, but the mother does not indicate what motion hearing or hearings are challenged, and the generalized complaints made in that section of the petition rehash others made elsewhere. We do not know if the motion or motions and any associated hearings were prior to the dispositional hearing or after, with one exception. There is one reference to evidence C.B. wanted admitted at the permanency hearing, but as we have noted, he was not a proper party to the action because he was not the child's biological parent and did not petition to intervene. Thus, his evidence was inadmissible and, moreover, may not be properly raised by the mother in her appeal.

As for (11), the mother raises concern about the ICWA: "ICWA intervention, as well as jurisdiction, has been duly deprived this mother, regardless of the evidence provided this court, or the evidence this court has provided to dispute this, since the inception of this CINA case."

On January 9, 2015, a petition to terminate parental rights was filed. On January 10, 2015, C.B. and E.B. filed a motion for visitation "7 days a week, unsupervised in our home; from 5 p.m. to 8 p.m. every evening." The mother attended the January 15, 2015 permanency hearing but left after C.B. was dismissed as a necessary party. Following that hearing and an order entered that same date, the mother and C.B., on January 22, filed an "answer concerning the permanency hearing" stating their objections to several of the court's findings, including that reasonable efforts had been made by the State to reunify. They also took issue with the denial of their motion that the judge recuse himself, the court's determination that other motions were abandoned by their departure from

the hearing, and to the dismissal of C.B. As part of this filing, they note that a motion to determine whether the ICWA applied had not been mentioned in the permanency order.

On February 18, 2015, a report to the court was filed in which it was noted that at the permanency hearing, the mother "provided testimony in regards to her Native American Heritage and provided family information." The report also states:

> Notice of Involuntary Child Custody Proceedings was mailed to United Keetoowah Band, Cherokee Nation, and Eastern Band of Cherokee Indians. The United Keetoowah Band replied stating that there was no evidence to support that [T.B.] was a descendant of their tribe and that they would not be intervening in the case. At the time of this report no information from the others regarding their intentions to intervene has been provided to the County Attorney's office.

The mother did not attend the February 25, 2015 termination-of-parental-rights hearing. The juvenile court determined ICWA did not apply. On appeal, the mother asserts, "The Polk County Attorney sat on the replies from the Indians in order to cut off any time needed for the parents to provide better information, then filed them later, too late to fix the issue."

As stated above, notice has been sent to three tribes. On January 27, 2015, the United Keetoowah Band responded there was no evidence to support the child is a descendent of the Band and it would not intervene. On February 6, 2015, the Cherokee Nation responded and indicated birthdate information was needed with respect to the maternal great-great-grandmother and the biological father. And, on March 3, 2015, the Easter Band of Cherokee Indians responded that the child was neither registered nor eligible to register. There remains some

question if ICWA applies. *See In re R.E.K.F.*, 698 N.W.2d 147, 150-51 (Iowa 2005) (stating "the proper procedure, at least when there is no other evidence the child is an Indian child, is to affirm the termination on the condition that the proper notification be provided").

We turn lastly to the twelfth and thirteenth issues asserted. In (12), entitled "the permanency hearing," the mother expresses dissatisfaction with the court's finding that she is unable to provide minimal parenting, and contends the court does not acknowledge she has learned some parenting skills. She also objects to the court's characterization that she and C.B. "abandoned" their motions, asserting, "This is an outright lie." Additionally, she challenges the court's refusal to recuse, after which she left the courtroom. She also contends she was only once asked if efforts at reunification were sufficient, and because she left the permanency hearing, the court then could not have asked her if reasonable efforts were being made.

With respect to (13), concerning the termination hearing, the mother asserts the department of human services (DHS) used "falsified" voice mail transcriptions "to show [C.B.] guilty of 1st degree harassment," and asserts that she did not attend the hearing because:

> the parents are afraid of the power wielded by this agency, and their influence over local law enforcement, as well as over the Judges, the lawyers, the local news media, and other agencies, and were afraid for their lives and their freedom; to show up for these hearings, as well as for the termination hearing.

The question of the mother's parental rights was certainly at issue, but there is nothing in this record that would suggest the mother's life or freedom was at stake by mere attendance of the hearings.

We have reviewed the record and note the January 15, 2015 permanency order provides:

> 8. The Motion to recuse filed on behalf of [E.B.] and made on the record by [E.B.] is DENIED.
> 9. All other motions and filings made by [C.B.] and [E.B.] are deemed abandoned as both [C.B.] and [E.B.] voluntarily left the hearing before the filings and motions could be addressed.

The December 26, 2014 motion to recuse offers no reason for the request. The mother's appeal asserts generalized but unsubstantiated claims of the trial court admitting false information.

> There is a constitutional right to have a neutral and detached judge. "A judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned." Before recusal is necessary, actual prejudice must be shown. "The test is whether a reasonable person would question the judge's impartiality." Speculation is not sufficient, and "there is as much obligation for a judge not to recuse when there is no occasion for him to do so as there is for him to do so when there is." The burden of showing grounds for recusal is on the party seeking it.

State v. Biddle, 652 N.W.2d 191, 198 (Iowa 2002) (citations omitted). The mother has failed to meet her burden of showing grounds for recusal.

As for the finding the mother abandoned other motions, we find no error. The mother acknowledges she did walk out of the permanency hearing and did not attend the termination hearing. Nonetheless, grounds for termination of parental rights must be shown by clear and convincing evidence. See Iowa Code § 232.116(1); In re A.B., 815 N.W.2d 764, 774 (Iowa 2012).

The juvenile court terminated the mother's parental rights pursuant to Iowa Code section 232.116(1)(b), (d), (e), and (h). "When the juvenile court terminates parental rights on more than one statutory ground, we may affirm the

juvenile court's order on any ground we find supported by the record." *A.B.*, 815 N.W.2d at 774. We find termination was proper under section 232.116(1)(h).

Section 232.116(1)(h) allows the court to terminate parental rights if a child who is three years old or younger has been adjudicated a CINA, has been out of the parent's custody for at least the last six consecutive months, and cannot be returned to the parent's care at present. T.B. is less than three years of age, having been born in July 2014.

The child was removed following a written consent to temporary removal signed by the mother on July 21, 2014. On July 29, after a hearing, the juvenile court confirmed the removal, finding:

> Mother is detached from the child. Neither mother nor father made any arrangements to care for the child prior to the birth of the child. Mother took the child to the hospital for observation and left the child at the hospital alone to care for a pet. Father came to hospital two times (briefly) in nine days while child was in hospital. Based upon observations of mother at the hospital, she is unable to care for this child on her own. She has struggled with feeding and other aspects of child care. Mother failed to take child to scheduled doctor appointment prior to removal. Mother failed to meet with Visiting Nurse Services for [a] scheduled appointment prior to child being place in hospital. Mother has not rescheduled appointment with VNS as mother stated that mother "had to work on herself first." Mother did not know how to properly place child in car seat. Mother stated that she did not feel that she should bring child back to residence with [C.B.] present as there have been disputes between [E.B.] and [C.B.] There is substantial evidence to support the allegations in the removal application. The child's life or health would be in imminent danger if returned to the custody of a parent because of the parent's inability to provide basic care like regular feeding and changing, lack of bond between mother/father and the child, referring to the child as "it", leaving the child at the hospital unaccompanied to return home to the dog, father's blog stating "I feel no connection to it whatsoever" in referring to child. [C.B.] is not the biological father of the child in interest. Both mother and father are homeless and testified that they cannot have custody of the child at this time.

The child was adjudicated a CINA on September 12, 2014, upon these findings of the juvenile court:

> The court makes the following specific findings of fact: DHS has offered the parents four visits per week. The parents missed many visits until August 7, 2014, when the parents unilaterally terminated visits. The parents then requested that only one visit per week take place which commenced in September 2014. Neither parent has obtained a substance abuse evaluation nor has either parent commenced substance abuse training. Both parents testified that they could not assume custody of the child at this time. The parents lack the basic skills needed to care for the child. Mother still struggles to properly diaper the child. Neither parent knew what the allegations of the State were in the petition nor could either recall seeing the petition despite acknowledging receipt of the petition. The father has been [removed] from the homeless shelter and the mother continues to reside in the homeless shelter. The father testified that he had been living in an apartment . . . for 3 weeks with a man but only knew his roommate's first name. The father's testimony is not credible. [C.B.] has a long established mental health history but is not seeking mental health treatment. Both [C.B.] and E.B. testified that [C.B.'s] roommate would be inappropriate to be with the child in interest. During the course of the hearing, [C.B.] terminated his involvement in the hearing and sat in the gallery. This Court also incorporates the finding of fact made in the July 29, 2014 removal hearing order.

As noted above, the mother could have contested the CINA adjudicatory, removal, and dispositional orders upon entry of the October 21, 2014 dispositional order, which is appealable.[4] *See A.M.H.*, 516 N.W.2d at 872. She did not do so, and those rulings are no longer subject to our review. *See D.S.*,

---

[4] On January 14, 2015, in addition to her pro se appearance, mother also filed a "notice of rescindment of signatures," in which she asserts earlier signatures were obtained under duress. She states: "being now of sound mind, hereby rescinds all signatures obtained under duress by Emily Nieman, social worker, for the Iowa Department of Human Services, and [her former attorney] Attorney Dale Mays, possessed by virtue of state law and made possible only because Emily Nieman and Dale Mays were clothed with the authority of the state, when action was taken under 'Color of State Law.'" Contrary to her contentions now that she did not sign the consent, the filing demonstrates she did. Her "rescindment" filed six months later does not alter the fact that the temporary removal was by signed consent. In any event, the removal was confirmed on other grounds by court order.

563 N.W.2d at 15 (stating principles of res judicata preclude court from re-litigating an issue that was previously decided).

At the start of the termination hearing, the court noted that the judicial assistant called for C.B. and E.B. at the courthouse and neither responded or appeared. The court also stated it was aware of several pre-trial filings by C.B. and E.B.:

> Some of them are denominated as motions, but no particular relief is being requested. Others are a final statement to the Court. The Court was prepared to address these with the filers as a part of this hearing, I think the most recent of which came in in the last 24 or 48 hours. However, neither [C.B. nor E.B.] are present, and the Court will deem these filings as abandoned by the parties.
> The Court, in reviewing these filings, also finds that there is no merit to any of the claims in any of these filings either by or on behalf of [E.B.] or by [C.B.], and the Court will deal with all of these in its written order. However, the Court will deny any of the relief requested, to the extent that relief is requested in these filings, as a part of its final order.

At the time of the termination hearing on February 25, 2015, the child had been out of the mother's custody for at least the last six consecutive months. "Once the limitation period lapses, termination proceedings must be viewed with a sense of urgency." *In re C.B.*, 611 N.W.2d 489, 495 (Iowa 2000).

The mother and C.B. have filed numerous documents with the juvenile court—and this court—contesting what they believe to be unjust and ill-motivated actions on the part of the State. Unfortunately, they have also removed themselves from the child's life. The mother has not seen the child since October 2014. She has not participated in services since November 2014.[5] The

---

[5] On February 12, 2015, the mother filed a statement of "no reasonable efforts provided" in which she asserts DHS failed to provide housing for her and her husband and failed to expedite a "FIP" application.

mother then was not able to demonstrate the ability to care for the child safely without prompting from providers. The juvenile court found:

> [The mother] was offered or received services to correct the circumstance which led to the adjudication and the circumstance continues to exist despite the offer or receipt of services. Because [E.B.] refused and/or failed to participate in any and all proffered services, it can only be concluded that the adjudicatory harms that led to the original removal and adjudication continue to exist.

We agree. *See id.* ("Insight for the determination of the child's long-range best interests can be gleaned from 'evidence of the parent's past performance for that performance may be indicative of the quality of the future care that parent is capable of providing.'" (citation omitted)). Under the circumstances presented, we find clear and convincing evidence that the child could not be returned to the mother's care at the time of the termination hearing without risk of adjudicatory harm.

Even after we have determined that statutory grounds for termination exist, we must still determine whether termination is in the child's best interests. Iowa Code § 232.116(2); *A.B.*, 815 N.W.2d at 776; *see also In re P.L.*, 778 N.W.2d 33, 39 (Iowa 2010). In evaluating this issue, we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). At the time of the termination hearing, the child was doing well in foster care. Whatever the cause for her lack of involvement, the mother had not seen the child for four months. We note the child's guardian ad litem was in agreement with the termination. The biological father had expressed interest in being involved in the child's life

and has engaged in services with DHS.  We find that termination of the mother's parental rights will allow for the child to achieve permanency.  Therefore, termination of the mother's parental rights is in the child's best interests, and none of the factors in section 232.116(3) apply to overcome that determination.

However, because this record leaves open the question whether T.B. is an "Indian child," we can only affirm the termination order conditionally.  *See R.E.F.K.*, 698 N.W.2d at 150–51.  We remand the case to the juvenile court for consideration of the child's Indian heritage in light of the Cherokee Nation's response concerning birthdate information being needed with respect to the maternal great-great-grandmother and the biological father.  If additional information is available, it must be provided.  If the tribe fails to respond within the appropriate timeframe or replies and determines the child is not eligible for tribal membership, the termination order will stand.  If the child is not determined to be an Indian child, the juvenile court's original termination order will stand.  If the tribe responds and intervenes, reversal of the termination order and further proceedings consistent with the ICWA requirements will be necessary.  We do not retain jurisdiction.

**FATHER'S APPEAL VACATED; MOTHER'S APPEAL AFFIRMED ON CONDITION AND REMANDED.**